COMMONWEALTH *vs.* WILLIAM A. ANDERSON.

Suffolk. November 5, 1985. — December 9, 1985.

Present: HENNESSEY, C.J., WILKINS, ABRAMS, NOLAN, & LYNCH, JJ.

*Homicide. Practice, Criminal,* Instructions to jury, Capital case. *Error,* Harmless.

A jury's finding of guilty of murder in the first degree was warranted by evidence that, shortly before the apparent time of the murder, the victim and the defendant were the only persons on the premises of a lounge operated by the victim, that a short time earlier the defendant had seen the night watchman place a gun in a food warmer in the kitchen of the lounge, that the defendant was angry at the victim because the victim owed him money, that the victim was seated at his desk in his office when he was shot, that five shots were fired at the victim, two striking him from a distance of three feet or more, that on·the day of the shooting the defendant disappeared, and that, when he was apprehended four months later in the State of New York, he gave inconsistent stories to police officers. [310-313]

Inasmuch as there was no evidence at the trial of a murder case tending to show self-defense or any other mitigating circumstances that might negate the element of malice aforethought, the judge's failure to instruct the jury on manslaughter created no risk of a miscarriage of justice. [313-314]

At the trial of a murder case, the judge's failure to charge the jury on the factors to be considered in evaluating the credibility of witnesses did not create a substantial risk of a miscarriage of justice. [314-316]

Although the judge at the trial of a murder case erred in failing to instruct the jury on the evidentiary effect of prior inconsistent statements, the error was harmless, where, even if the inconsistent statements were considered by the jury for substantive purposes, they could have had little effect on the defendant's defense. [316]

The judge at the trial of a murder case was not required in his instructions to the jury to single out and emphasize the weight to be given to testimony of police officers, where the charge as a whole adequately covered the subject of witness credibility. [316]

Having examined the record of a murder case in accordance with the requirements of G. L. c. 278, § 33E, this court concluded that there was no evidence presented to justify a new trial or a reduction in the verdict from murder in the first degree. [317-318]

INDICTMENT found and returned in the Superior Court Department on September 10, 1982.

The case was tried before *John T. Ronan*, J., and a motion for a new trial was heard by him.

*Nona E. Walker,* Committee for Public Counsel Services, for the defendant.

*Robin A. Pearl,* Assistant District Attorney, for the Commonwealth.

NOLAN, J. The defendant was convicted of the murder in the first degree of John H. Tinker and sentenced to life imprisonment.[1] After the jury were dismissed, the defendant filed a motion for a mistrial which was orally changed to and treated as a motion for a new trial. The trial judge denied the motion. The defendant appeals his conviction and the denial of his motion for a new trial, and contends that (1) the judge erred in denying his motions for a required finding of not guilty where the evidence was insufficient to prove beyond a reasonable doubt that the killing was done with deliberate premeditation, (2) the judge's failure to instruct the jury on manslaughter created a substantial risk of a miscarriage of justice, and (3) the judge erred in refusing to instruct the jury on the use of prior inconsistent statements, on specific factors which may bear on the credibility of a witness, and on the weight to be given to police officers' testimony, resulting in a substantial risk of a miscarriage of justice. Finally, the defendant requests that in the interests of justice we invoke our power under G. L. c. 278, § 33E (1984 ed.), and direct the entry of a verdict of a lesser degree of guilt than murder in the first degree or, in the alternative, order a new trial. After reviewing the entire record and for the reasons stated herein, we affirm the conviction. We state the evidence as it was presented to the jury.

On February 27, 1982, the defendant reported to work at Tinker's Lounge[2] at approximately 9:50 A.M. He brought with

---

[1] This was the second trial. The defendant's first trial ended in a mistrial because of a deadlocked jury.

[2] Tinker's Lounge employed approximately twenty to twenty-four people who usually finished work at 2 A.M. They had access to the kitchen. Some may have had knowledge of the gun that figures in this case.

him clothes in a bag which he hung in the cloak room. The defendant walked into the kitchen and then came out. The lounge was owned under the name of 888 Tremont Street, Inc., and operated by the victim, John H. Tinker. When the defendant arrived at the club the nightwatchman, Zatic Simpson, was just finishing his shift.

The nightwatchman went into the kitchen and put his .38 caliber pistol, which was in its holster, in a food warmer. The defendant was present in the kitchen while this occurred. The two conversed for a few minutes.[3] The defendant told Simpson that on Friday he had spoken with Linda Dunlap, Tinker's secretary and live-in girl friend, about a pay raise. He also said that he was going to see Tinker about money. Simpson stated that the tone of the defendant's voice was "ordinary" during their conversation, although the defendant seemed to be a "little upset." The victim then arrived at the club through the front door. The nightwatchman punched his time card at 10:04 A.M., and left the building through the front door. Simpson testified that the defendant walked back into the kitchen. As Simpson was leaving the premises, he noticed the victim letting his dog out the back door.[4] It was the victim's custom to lock the door after letting the dog out, leaving his key in the door's inside lock. No other persons were observed in the street near the club door at this time.

At approximately 11:30 A.M.[5] Howard Davenport, the general manager of Tinker's Lounge, arrived at the club. He used his key to enter through the front door.[6] When he noticed that the victim's office door was open and that money was strewn on the floor, he thought that a robbery had occurred. He did not immediately see the victim. After checking the back door

---

[3] The nightwatchman told the police on another occasion that the defendant had assured him that he, the defendant, was quitting.

[4] Simpson had worked for the victim for approximately eighteen years. He left his employment one to two weeks after the shooting.

[5] A police officer testified that Davenport stated to him that he had arrived at the club at 11:55 A.M.

[6] Dunlap, Simpson, and the victim's son also had keys to the club. The defendant did not.

and noticing that it was unlocked, Davenport discovered the body of John Tinker slumped behind his desk. He saw blood on Tinker's face, and a bullet hole in his forehead. Davenport telephoned Dunlap and instructed her to call the police.[7] The police received a telephone call at 12:05 P.M. When they arrived ten minutes later, the paramedics were already there and were nearly finished with their duties.

An investigation revealed that the nightwatchman's gun was missing. When Officer Frank Mulvey arrived, the holster was on the warmer in the kitchen. Police officers were unable to obtain any fingerprints from the holster. The back door was closed but unlocked and the keys were missing.[8] There were three bullet holes in the wall behind the victim's desk. There was no dry cleaning bag hanging in the cloak room. The victim's dog was inside. There were no signs of a break-in.

The victim's body contained two bullets.[9] The medical examiner testified that the bullets were fired from a distance of more than three feet. The gun used could have been either a .38 caliber pistol or a .357 magnum. It was apparent that the victim had been adding receipts from the previous evening's business because the safe door was open and money and receipts were on the floor. The parties stipulated that there was about $2,000 in cash in the office. Because the office was in "a shambles," the victim's son was unable to put the receipts together to determine if any money had been stolen. A .25 caliber pistol owned by the victim was found in the pocket of the victim's jacket which was over a baby's crib in the office.

On the day of the shooting investigators searched for the defendant at a place to which the victim's son had once given the defendant a ride. At that point, investigators did not know

---

[7] Dunlap testified that Davenport telephoned her at approximately 11 A.M.

[8] The back door leading to the street was usually kept open for delivery people. The inside door was always kept locked. In between was a foyer.

[9] The pathologist testified that rigor mortis had not set in by 3 P.M. on the afternoon of February 27. He further testified that it takes approximately four to eight hours for the process to be completed, depending upon the temperature of the room. The victim's office was warm that day because the heat had been turned on.

where the defendant lived. The defendant was found four months later in a "flop-house" in Fallsburg, New York. At first, the defendant told the police that he knew nothing about Tinker's death. He later mentioned that he and Tinker had a fight over a check and that he had heard about the shooting on the news.

A few days before the killing, the defendant had spoken with Dunlap about the victim's owing him five dollars on his salary. It is unclear whether the amount owed was five dollars a day or five dollars a week.

The defendant's sister testified that on the eve of February 27, 1982, her brother visited her for approximately twenty minutes. He told her that he was leaving to search for another job.[10] He was going to ask his mother to get the money that the victim owed him. The defendant left his keys and his dry cleaning ticket with his sister. His sister also testified that, on the morning of the shooting, the defendant visited her between 10:15 A.M. and 10:30 A.M. She remembered the time because her children were arguing over whether to watch the wrestling match on television. The defendant at that time was carrying his clothes in a dry cleaning bag. The sister had told the police on three prior occasions[11] that her brother had arrived at 9:00 A.M. and left at approximately 9:15 A.M., not saying where he was going. The sister also telephoned for a taxi for the defendant sometime between 10:50 A.M. and 11:10 A.M. on February 27. A witness from the taxi company verified the call but the report was unclear whether the call was received at 11:11, 11:15, or 11:51 A.M.

1. *Motions for a required finding of not guilty.* At the close of the Commonwealth's evidence and again at the close of all the evidence, the defendant moved for a required finding of not guilty. The trial judge denied both motions. The defendant

---

[10] The defendant never told Davenport that he was going to quit. The victim's son testified that Dunlap told him that the defendant was upset, but she never mentioned that the defendant said he was going to quit.

[11] She made this statement to Officer Frank Mulvey and to Officer Francis McCarthy on one occasion, and to Officer McCarthy on another occasion. Officer McCarthy recorded only their first conversation.

claims error in the judge's denial because there was insufficient evidence of deliberate premeditation to warrant submission of the case to the jury on murder in the first degree.

Our standard of review of a denial of a motion for a required finding of not guilty is "whether the evidence received, viewed in a light most favorable to the Commonwealth, is sufficient so that the jury 'might properly draw inferences, not too remote in the ordinary course of events, or forbidden by any rule of law, and conclude upon all the established circumstances and warranted inferences that the guilt of the defendant was proved beyond a reasonable doubt.'" *Commonwealth* v. *Clary,* 388 Mass. 583, 588 (1983), quoting *Commonwealth* v. *Vellucci,* 284 Mass. 443, 445 (1933). "The inferences cannot be too remote but 'allowable inferences need not be necessary or inescapable.'" *Commonwealth* v. *Lanoue,* 392 Mass. 583, 589-590 (1984), quoting *Commonwealth* v. *Rojas,* 388 Mass. 626, 630 (1983).

The evidence must be "sufficient to satisfy a rational trier of fact of each element of the crime [in this case murder in the first degree] beyond a reasonable doubt." *Commonwealth* v. *Basch,* 386 Mass. 620, 622 (1982). We conclude that the Commonwealth presented sufficient evidence to warrant submission of murder in the first degree to the jury.

"To prove deliberate premeditation, an essential element of murder in the first degree, the Commonwealth must show that the defendant's resolution to kill was a product of cool reflection. '[W]here the purpose is resolved upon and the mind determined to do it before the blow is struck, then it is, within the meaning of the law, deliberately premeditated malice aforethought.'" *Commonwealth* v. *Blaikie,* 375 Mass. 601, 605 (1978), quoting *Commonwealth* v. *Tucker,* 189 Mass. 457, 494 (1905).

The case at bar was proved by circumstantial evidence. Circumstantial evidence is competent evidence to establish guilt. *Commonwealth* v. *Starling,* 382 Mass. 423, 425-427 (1981). Although the Commonwealth need not prove that no one else could have committed the murder, *Commonwealth* v. *Casale,* 381 Mass. 167, 175-176 (1980), it must prove more

than just the fact that the defendant had the opportunity to commit the crime, and was the last person to see the victim alive. *Commonwealth* v. *Rojas, supra*. The question of guilt must not be left to conjecture or surmise. *Commonwealth* v. *O'Brien,* 305 Mass. 393, 401 (1940).

Simpson testified that the defendant was present at Tinker's Lounge around 10 A.M., which could have been near the time of the shooting. He also testified that the defendant was aware of the gun. From Simpson's testimony, the jury could have inferred that no one else was present at the lounge at the time of the shooting and that all the doors were locked from the inside. The defendant was angry and upset at the victim because the victim owed him money, although the tone of the defendant's voice was "ordinary" when he arrived at the lounge on the day of the shooting. The gun was located in the kitchen and the victim was seated at his desk in his office when he was shot. Five shots were fired at the victim, two striking him from a distance of three feet or more. This evidence was sufficient for a rational trier of fact to conclude that the shooting was the product of "cool reflection." "As long as there exists a period of time, however brief, between premeditation and the act, that is sufficient for submission of the issue of murder in the first degree to the jury." *Commonwealth* v. *Lanoue, supra* at 590.

Furthermore, there was evidence that the defendant fled after the shooting and that he gave inconsistent stories to police officers when he was apprehended. In drawing inferences, the jury are permitted to consider actions and statements of the defendant that tend to show a consciousness of guilt. *Commonwealth* v. *Booker,* 386 Mass. 466, 469-470 (1982).[12]

The defendant relies on *Commonwealth* v. *Salemme,* 395 Mass. 594 (1985), to demonstrate support for his motions for a required finding of not guilty. The circumstances in *Salemme, supra,* are distinguishable from those in the present case. There,

---

[12] We emphasize, however, that actions of flight alone are not sufficient to convict. *Commonwealth* v. *Best,* 381 Mass. 472, 483 (1980) Nor is such evidence relevant to proving the element of deliberate premeditation. See *Commonwealth* v. *Blaikie,* 375 Mass. 601, 605 (1978).

substantial evidence was presented that two persons had an equal opportunity to commit the murder. In reversing the conviction, we determined that, as the "evidence tend[ed] equally to sustain either of two inconsistent propositions, neither of them [could be] said to have been established by legitimate proof." *Id.* at 601, quoting *Commonwealth* v. *Fancy,* 349 Mass. 196, 200 (1965). Here, the jury had sufficient evidence from the government's witnesses as to time and place to draw plausible inferences that the defendant was present at the time of the shooting, had a motive for the killing, and fled the scene, evidencing a consciousness of his guilt. The evidence was substantial enough so that the question of guilt was not left to conjecture or surmise. It was up to the jury to assess the credibility of the witnesses and to determine the facts. We find no error in the judge's denial of the motions for a required finding of not guilty.

2. *Judge's failure to instruct on manslaughter.* The defendant next assigns as error the judge's failure to instruct the jury on manslaughter. Because the defendant did not request such an instruction at trial and did not object at trial to the failure to give it, our standard of review under G. L. c. 278, § 33E, is whether the failure to instruct the jury on manslaughter created a substantial risk of a miscarriage of justice. *Commonwealth* v. *Garcia,* 379 Mass. 422, 439 (1980). We conclude that it did not.

An instruction on manslaughter is required if any view of the evidence would permit a manslaughter finding, and even if the defendant raises the defense of total lack of involvement. *Commonwealth* v. *Walden,* 380 Mass. 724, 726 (1980). On the other hand, as in the present case, the judge is not required to charge on a hypothesis unsupported by the evidence. In such circumstances, it is error to give such an instruction. *Id.* at 727.

To constitute voluntary manslaughter, the evidence must show "a killing from a sudden transport of passion or heat of blood, upon a reasonable provocation and without malice, or upon sudden combat." *Id.,* citing *Commonwealth* v. *Soaris,* 275 Mass. 291, 299 (1931). "Sudden combat" may constitute

reasonable provocation or a "perturbation of the mind" negating malice. See *Commonwealth* v. *Walden, supra* at 727. In the present case, there was no hypothesis in the evidence indicating that something occurred which would have caused an ordinary person to go into such a state of "passion, anger, fear, fright or nervous excitement as would eclipse his capacity for reflection or restraint." *Id.* at 728.

Here, there was the absence of a struggle. In fact, the pathologist testified that there was a "graze" on the victim's hand, possibly caused by a bullet, which indicated that perhaps the victim had lifted his hand in self-defense. Five shots were fired from a distance of three feet or more; the defendant was in an "ordinary" mood when he arrived at the club. Although there was evidence introduced that the victim and the defendant had an argument over a check, mere words alone generally do not constitute sufficient provocation to warrant a manslaughter charge. See *Commonwealth* v. *Hartford,* 346 Mass. 482, 490-491 (1963).

Moreover, there was no evidence introduced to warrant a charge on involuntary manslaughter. Involuntary manslaughter is "an unlawful homicide unintentionally caused by an act which constitutes such a disregard of probable harmful consequences to another as to amount to wanton or reckless conduct." *Commonwealth* v. *Vanderpool,* 367 Mass. 743, 747 (1975). Five bullets could not have been fired unintentionally. See *Commonwealth* v. *LeBlanc,* 373 Mass. 478, 491 (1977). Examining all of the evidence and permissible inferences, we conclude that there was not a scintilla of evidence in this case tending to show self-defense, or any other mitigating circumstances that might negate the element of malice aforethought.

3. *Judge's refusal to instruct on prior inconsistent statements, witness credibility, and weight of police officers' testimony.* The defendant next contends that the judge did not instruct the jury on the use of prior inconsistent statements, on the factors to consider in assessing a witness's credibility, or on the weight to be given to police officers' testimony.

Although the defendant submitted requests for instructions,[13] he did not object at trial to the judge's failure to give the instructions. We review the defendant's contentions in light of our obligation under G. L. c. 278, § 33E, i.e., whether the lack of instructions created a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Doucette,* 391 Mass. 443, 450 (1984); *Commonwealth* v. *Albert,* 391 Mass. 853, 857 (1984).

The judge's failure to instruct the jury on factors pertaining to the credibility of witnesses did not create a substantial risk of a miscarriage of justice. In his closing argument, defense counsel made clear to the jury that the case hung on the credibility of the witnesses.[14] The judge's instructions were complete

---

[13] Specifically, the defendant has argued in his brief that the judge erred in not giving the following requested instructions.

"14. Evidence has been received in this case to the effect that one or more witnesses have made some prior statements which are inconsistent or contradictory to that which the witness or witnesses testified to in court. Such evidence may be taken in consideration by you in weighing that witness's testimony and in determining his credibility as to the remaining portions of his testimony.

"15. It is your duty as a jury to scrutinize and weigh the testimony of each witness and to determine the effect of the evidence as a whole. You are the sole judges of the credibility of witnesses and of the weight and credit to be given to their testimony.

"16. In determining the weight and credit you should give to the testimony of each witness, you should consider one's interest in the outcome of the trial, one's conduct and demeanor on the witness stand, one's bias or prejudice if any has been shown, also the lack of clearness of one's recollections, one's opportunity for observing and knowing the matters and things testified to and the reasonableness of the testimony. Also you should consider all other facts and circumstances appearing at the trial which tend either to support or to discredit the testimony, and then you should give to the testimony of each witness such weight and credit as you believe it fairly is entitled to receive.

"17. The law does not require you to believe any particular witness merely because his testimony was not uncontradicted."

[14] For instance, in reference to Dunlap's testimony, defense counsel argued, "Are you going to believe a witness like that?" He further stated that there was no question in his mind that Linda was a partial, biased witness. Defense counsel also attacked Davenport's credibility by emphasizing Davenport's inconsistent statement as to the time that he supposedly arrived at the club. Finally, in reference to Simpson, defense counsel emphasized Simpson's inconsistent statements regarding whether the defendant stated that he was going to quit his job.

with respect to his definition of circumstantial evidence, proof beyond a reasonable doubt and on the elements of murder in the first degree. Moreover, the judge commented on witness credibility at various times throughout his charge to the jury.

We hold that the judge erred in not charging on the evidentiary effect of prior inconsistent statements. However, the error was harmless. *Commonwealth* v. *Martin,* 19 Mass. App. Ct. 117, 120 (1984). In the circumstances, the prior inconsistent statements may have been considered substantively by the jury. See *Commonwealth* v. *Gil,* 393 Mass. 204, 220 (1984). The defendant's alibi defense was not damaged by the consideration of the statements substantively. If the jury believed the officers' testimony that the defendant's sister had told them that the defendant was at her house from 9:00 - 9:15 A.M. on the morning of the shooting, instead of 10:15 - 10:30 A.M. which was her testimony on the witness stand and which is the testimony that the defendant wanted the jury to believe, the jury still could have found that the defendant was present at the scene shortly after 10:00 A.M. when the murder occurred.[15] In fact, the sister's testimony was bolstered by the testimony of the witness from the cab company who stated that a cab was called to the sister's house at 11:00 A.M. or later. Furthermore, Davenport's inconsistent statement, that he arrived at the club at 11:55 instead of 11:30, if considered substantively, again, had little effect on the defendant's alibi.

The judge is not required to grant a particular instruction so long as the charge, as a whole, adequately covers the issue. *Commonwealth* v. *Lowe,* 391 Mass. 97, 109, cert. denied, 469 U.S. 840 (1984). Here, the judge was not required to single out and emphasize the weight to be given to police officers' testimony. *Commonwealth* v. *Weaver,* 395 Mass. 307, 313 (1985). Examining the charge as a whole, we conclude that the judge adequately covered the realm of witness credibility.

---

[15] The defendant's sister testified that it takes approximately nine minutes to get from the lounge to her house by taxi, and no more than thirty minutes by public transportation.

4. *Review under G. L. c. 278, § 33E.* The defendant contends that we should exercise our powers under G. L. c. 278, § 33E, and either order a new trial or direct the entry of a verdict of a lesser degree of guilt because of the omission of the manslaughter instruction and because the weight of the evidence requires the entry of such a verdict.

General Laws c. 278, § 33E, "consigns the facts as well as the law to our consideration, gives us the power and duty exercised by a trial judge on a motion for a new trial, and requires us to consider the whole case broadly to determine whether there was any miscarriage of justice. . . . If upon our examination of the facts, we should, in our discretion, be of opinion that there was a miscarriage of justice in convicting the defendant of murder in the first degree, and that a verdict of guilty of murder in the second degree or of manslaughter would have been more consonant with justice, it is now our power and duty so to declare." *Commonwealth* v. *Williams,* 364 Mass. 145, 150 (1973), quoting *Commonwealth* v. *Baker,* 346 Mass. 107, 109 (1963). "[W]e must consider whether the verdict of murder in the first degree was against the weight of the evidence considered in a large or nontechnical sense." *Commonwealth* v. *Almon,* 387 Mass. 599, 604 (1982). Nevertheless, "[w]e do not sit as a second jury to pass anew on the question of the defendant's guilt." *Commonwealth* v. *Reddick,* 372 Mass. 460, 464 (1977).

The circumstances in the present case indicate that a deliberately premeditated murder was committed by the defendant. There was no evidence that the defendant's intentional use of a deadly weapon was formed in the heat of sudden affray or combat. See *Commonwealth* v. *Baker,* 346 Mass. 107, 109-110 (1963). There was no evidence of an argument, or a "senseless brawl," see *Commonwealth* v. *Ransom,* 358 Mass. 580, 583 (1971), or that the victim was the aggressor, see *Commonwealth* v. *Kendrick,* 351 Mass. 203, 210 (1966). Nor was this a case of "uncontrolled anger and violent action on the part of both the defendant and the decedent." *Commonwealth* v. *Ransom, supra.*

The jury were entitled to disbelieve the defendant's alibi and to find that the defendant was present at the murder scene, had access to the gun, shot and killed the victim, and then fled the area because of his consciousness of guilt. There simply was no evidence presented to justify a reduction in the verdict from murder in the first degree. Cf. *Commonwealth* v. *Dalton,* 385 Mass. 190, 196 (1982).

As G. L. c. 278, § 33E, requires, we have examined the entire case on the law and the evidence, and we conclude that the interests of justice do not warrant the entry of a verdict of a lesser degree of guilt.

*Judgment affirmed.*

*Order denying motion*
*for new trial affirmed.*