COMMONWEALTH vs. MICHAEL M. O'LAUGHLIN.

No. 04-P-48.

Berkshire. January 12, 2005 - July 8, 2005.

Present: LAURENCE, SMITH, & MILLS, JJ.

Further appellate review granted, 445 Mass. 1101 (2005).

*Burglary. Armed Assault in a Dwelling. Armed Assault with Intent to Murder. Assault and Battery by Means of a Dangerous Weapon. Practice, Criminal,* Required finding.

The judge at a criminal trial erred in denying the defendant's motion for a required finding of not guilty, where no other evidence apart from motive, means, and opportunity was adduced linking the defendant to the crime, and where the introduction of substantial third-party culprit evidence detracted from the Commonwealth's case. [817-824]

INDICTMENTS found and returned in the Superior Court Department on December 6, 2000.

The cases were tried before *Thomas J. Curley, Jr.*, J.

*Kenneth I. Seiger* for the defendant.

*Joseph A. Pieropan*, Assistant District Attorney, for the Commonwealth.

MILLS, J. After a jury trial in the Superior Court the defendant was convicted of (1) burglary and armed assault in a dwelling; (2) armed assault in a dwelling; (3) armed assault with intent to murder; and (4) assault and battery by means of a dangerous weapon. On appeal he argues that (1) the evidence was insufficient to sustain the convictions and that the judge therefore erred in denying his motion for a required finding of not guilty; (2) the evidence that he withdrew his consent to allow the police to collect a sample of a small stain found on a closet door violated his right against self-incrimination; (3) prior bad act evidence concerning his drug use was improperly admitted;

(4) his request for a hearing to challenge the reliability of deoxy-ribonucleic acid (DNA) evidence was improperly denied; (5) the judge's instruction on armed assault with intent to murder failed to inform the jury that the specific intent to kill was an element of the offense that must be proven; (6) the judge improperly excluded a note that was probative of a third party's intent to murder; (7) the judge improperly denied the defendant's motion to dismiss the indictments on grounds that the grand jury proceedings were flawed; and (8) the prosecutor misstated the evidence in his closing argument.

1. *Facts.*[1] Shortly after 6:00 A.M. on November 17, 2000, the victim was discovered in her apartment, numbered 15, and located on Ecstatic Way, a street in the Fox Hollow condominium complex in Lee. She had been severely beaten and was covered in blood, but was still alive.

Shortly before 2:00 A.M. that morning, the victim's neighbor, George Whittemore, had been awakened by banging and screaming sounds coming from the apartment directly below his, where the victim was the sole occupant, having recently separated from her husband of twenty-six years, David Kotowski. Whittemore testified that the banging sounded like "wood hitting wood," the screaming was that of a woman, and the sounds lasted for about thirty seconds. Although Whittemore was unsure whether "it was serious or not," the sounds were troubling enough that he called 911.[2]

Police officers Tierney and Skowron were dispatched to Fox Hollow shortly before 2:00 A.M. They arrived about six or seven minutes later, parked and exited the police cruiser and began to look for apartment number 202, the number reported in the dispatch.[3] As they searched, they saw the defendant walking

---

[1]We summarize the facts in the light most favorable to the Commonwealth. *Commonwealth* v. *Conkey,* 443 Mass. 60, 72 (2004). See further comment, *infra* at 817-818.

[2]Telephone records show that Whittemore's call was made at 1:55 A.M.

[3]The task was difficult because the apartment numbers had recently been changed and the number on the exterior of Whittemore's apartment was now posted as 16. In addition, once Whittemore saw the police arrive, he did not go out to meet them, but went back to sleep.

toward them on the sidewalk near unit 19, where he lived.[4] He was dressed only in boxer shorts, but appeared to be impervious to the thirty or thirty-five degree air temperature. Officer Skowron and the defendant recognized one another. The defendant asked what had happened, and Officer Skowron told him that they were responding to a report of a woman screaming. When asked if he had heard any screaming, the defendant said that he had been awakened by screaming, and explained that he thought it was an animal in the dumpster because "they'd been having problems with raccoons getting stuck in the dumpster" and that he had put a stick in there in an effort to prevent animals from getting trapped.[5] The police described the defendant as appearing uneasy or distant, and testified that he kept his head down, never looking directly at either officer as he spoke with them. While Skowron and the defendant remained on the sidewalk, talking, Tierney walked over to the dumpster and looked inside, seeing a stick, but no animals. The defendant returned to the building and the police continued to check the area. After circling the complex and detecting no sound or other indications of a problem, the officers left.

Whittemore had difficulty sleeping soundly that night. He was awakened several times by the sound of a woman moaning and crying directly below him. In the morning, he heard what sounded like glass breaking, and a man yelling "Oh, my God." The voice was that of James Finn, a man with whom the victim had become increasingly friendly over the past few months, and who had a routine each weekday morning of stopping at the victim's apartment between 5:30 A.M. and 6:30 A.M., so that the two could have coffee together before work. On November 17, 2000, Finn became concerned when the victim did not answer the door after he knocked repeatedly at about 5:45 A.M. Finn could only hear her saying in a very odd or unusual voice, "Who is that?" After unsuccessfully trying to telephone her from Lee, where he located the nearest pay phone, Finn decided

---

[4]He had then worked at Fox Hollow for about eighteen months doing construction and maintenance.

[5]A senior maintenance worker, one Laurence Carroll, testified that the defendant had informed him, prior to the evening in question, about the need to open the lid in order to prevent animals from getting trapped and then squealing.

to return and break into the apartment. He was able to force open the locked sliding glass door at the rear of the apartment and enter the dining and living area. Nothing seemed amiss, so he continued down the hallway to the victim's bedroom. There he found her lying curled up on the floor, covered with blood. Blood was "everywhere" in the bedroom. He called 911.[6]

An ambulance was dispatched to the apartment at about 6:24 A.M., and within fifteen or twenty minutes, the victim was taken to the Berkshire Medical Center.[7] Officer Skowron arrived at the scene at about the same time as the ambulance. Apart from the bedroom, he found the apartment neat and intact, but noticed the victim's purse on the living room floor, which contained, among other things, the victim's identification, credit cards, about $28 in cash, and a checkbook.

Officer Tierney arrived about forty-five minutes later, at 7:15 A.M. He and Skowron examined the bedroom, the only place where there was blood. There was a fair amount of blood on the bed, the floors, the walls, and the door jambs to the bathroom and living areas. Blood had pooled in several spots on the floor, and blood on the walls and door jambs was no more than about eighteen inches from the floor. The bedding, which included sheets and a blanket and comforter, were "ruffled up, as if somebody was in it." There was also "quite a bit" of blood that appeared to be splatter on the comforter. There was a pillow in the bedroom that was "heavily saturated with blood in two distinct spots." Police also noticed that the bed rail that was part of the canopy on the victim's bed had a small dent in it and wood splinters were found on the floor directly below the dented portion.

Apart from the ruffled bedding, damaged bed rail, and blood, nothing else appeared to have been touched or displaced in the bedroom. Pictures were properly displayed, letters were stacked, clothing was neatly folded, figurines were upright, fresh roses

---

[6]Although police initially considered Finn among the possible suspects, that possibility was dismissed based upon his demeanor of obvious shock and distress at the scene, his willingness to cooperate completely with the investigation, and confirmation of his alibi.

[7]The victim testified at trial and said that she had no memory of the incident or of the weeks that followed the attack.

were arranged in a vase, and the dresser drawers were closed. On the dresser, unsecured, were several pieces of valuable jewelry, including diamonds, pearls, and an expensive watch. There was $522 in cash in one of the dresser drawers.[8] At about 8:30 A.M., Skowron left to go to the hospital while Tierney remained at the scene, primarily to collect evidence.

Constance Cappel, who lived alone in the apartment between the defendant's apartment and the victim's, had been awake for several hours, meditating, when at about 6:45 A.M. her attention was drawn to voices near the entrance to the victim's apartment.[9] She looked outside and saw policemen and two ambulances. She dressed, went outside, and saw the victim being put into the ambulance. When Cappel got no information from the police, she went to the defendant's apartment and knocked. He, in his boxer shorts, answered the door, looking like he had just awakened. Cappel said, "Michael, I think someone's been murdered or something." The defendant responded, "What do you want me to do about it?"

At about 8:45 A.M., the defendant, dressed for work, came out of his apartment and approached Carroll (his coworker) and Cappel. The defendant asked Carroll what was happening, and after Carroll responded, the defendant explained his earlier encounter with the police. He told Carroll that he had been awakened by police cars and the sound of the radios in those cars. He also said that he had told police that he thought raccoons had been in the dumpster making a "kind of squealing sound."

At about 10:00 A.M., Tierney saw the defendant outside the victim's building and asked him to go to the Lee police station to give a statement. Tierney noticed a "scratch or a dig mark in his left cheek, small cut on his chin and a round, circular bruise just on his neck, just below his left ear," but was unsure whether the bruises or injuries were fresh. In response to the request for a statement, the defendant became "very defensive and apprehensive," but when Tierney assured him that he would be the one conducting the interview, the defendant agreed to go

---

[8]Later, the victim confirmed that none of the valuables she kept in the apartment were missing.

[9]Prior to this time, Cappel heard nothing that disturbed her meditation.

to the police station.[10] He arrived at about 10:40 A.M., and was told by Chief Glidden to wait for Tierney, who was not yet there. When Tierney arrived twenty minutes later, at about 11:00 A.M., he told the defendant that he would be right with him and went into the chief's office for about five minutes. When Tierney came out of the office, the defendant was not there, but had gone back to Fox Hollow where he saw Carroll and told him the person he was supposed to meet up with was not there. After discussing the situation further, Carroll agreed to go back to the station with the defendant and they arrived about twenty minutes later. This time, Chief Glidden was able to take the defendant's statement[11] and they spoke for about ten minutes, during which time the defendant seemed agitated. The defendant said that he had been "drinking before he went to bed and he just didn't think he was awake until he heard the cruisers at approximately two o'clock," but may have heard something before that, but he was not sure. The defendant said he had seen the victim around, and that he and a friend had joked about a boyfriend she had. The defendant also said that he had been in her apartment to repair a window.

Trooper Buell arrived at Fox Hollow at about 12:00 P.M. At about 1:00 P.M., he saw the defendant coming from his apartment and they spoke for about fifteen or twenty minutes. The defendant told Buell that on the previous evening he had been out with an individual named Mark Puleri, and that he and Puleri went to Pittsfield and returned at 10:30 P.M. The defendant stated that he was awakened by screaming, which he thought was a fox fighting with a raccoon, and that after the officers came and left, he went back to sleep. He stated that he awoke at 7:30 A.M. when his neighbor, Cappel, knocked on his door and told him there had been a murder.

Buell asked for consent to search the defendant's apartment in order to eliminate him as a suspect; the defendant permitted Trooper Berkel to enter and take photographs, and also let two

[10]Before leaving, the defendant met up with Carroll and Tim Mansfield, another employee at Fox Hollow, and explained that the police wanted to talk with him and that he was nervous about going to the station alone. Mansfield offered to go with him, but the defendant decided to go alone.

[11]Glidden did not read the defendant his Miranda rights because the defendant was not yet a suspect.

State police chemists enter to look for blood stains. When one of the chemists saw a red stain on a closet door that was within arm's reach of the stove and food preparation area, he asked whether the defendant's consent included taking swabbings. Shortly afterwards, the defendant asked all the officers to leave. The police left, conferred outside the apartment and, after deciding to apply for a search warrant, returned to inform the defendant of their intent to secure the apartment. The defendant told them a warrant was unnecessary — he would allow them inside, and thought the stain on the closet was his own blood, although he was not sure what it was. He told the officers that he had wiped the stain off with his finger.[12]

Although the stain was gone when the chemists returned, the area of the stain tested positive for the presumptive presence of blood, and a sample collected by swabbing was sent to the laboratory. Small, red-brown stains found on the wall above the bedroom dresser and on the bathroom floor were also collected. In addition, two small stains that also appeared to be blood were cut from the defendant's bed comforter. All of the samples were forwarded to the police laboratory. The defendant also released to the police the clothes he had been wearing the night before and he allowed the chemist to examine his boots.

At about 3:10 P.M., Neil Raymond, a State trooper from the canine unit, arrived at the scene with his dog, Webster. After obtaining some background information, Raymond directed Webster to search the Fox Hollow complex for any items related to the crime. Webster located an aluminum baseball bat lying on the ground, which appeared to have been covered with some leaves and debris, but was otherwise clean. The bat was between thirty and fifty feet from the dumpster, in a southerly direction away from the victim's building.[13] The bat was photographed, and an

---

[12]The defendant also explained to an officer that he was concerned they would find drug paraphernalia and some cash in the apartment. Buell obtained a second consent form from the defendant, had him check and secure the cash in his dresser, and told him that if he turned over the drug paraphernalia he would not be charged with possessing it, whereupon he went to a closet and removed soda cans that had been fashioned into a pipe and gave them to Buell.

[13]The area was wooded, bordering Summer Street, and the bat was about halfway between the blacktop on Summer Street and the iron rail fence that ran along the north shoulder of Summer Street.

inscription bearing the defendant's last name, O'Laughlin, could be seen on the lower third of the bat, near the taped handle. The bat was placed in a bag and handed to Trooper Hill at the crime scene van.[14]

On the evening of November 20, 2000, the defendant called a friend, Lisa Frenis. He was upset, told her that "he was a suspect in the assault that happened within the apartment complex," and expressed concerns about his situation but said that he was "very happy that she had survived . . . [s]o that she could identify her assailant." The defendant said that, with his "bad luck," the assailant was probably wearing a mask and came in with a baseball bat. At about 10:30 that same evening, the defendant was arrested. During the booking process Trooper Hill saw a blemish mark or injury to the defendant's face and observed that the defendant signed all of the documents with his left hand.

Further investigation revealed that the defendant had not been entirely truthful with Buell when he discussed his activities in the hours preceding the assault. Mark Puleri testified that he and the defendant had made two trips to Pittsfield on the evening of November 16, 2000, to purchase "crack" cocaine. After the first trip, Puleri brought the defendant to his home; there, Puleri, the defendant, and Puleri's roommate smoked the recently purchased drugs. The defendant wanted to buy more crack cocaine, so Puleri took him back to Pittsfield to make a second purchase. After obtaining more crack cocaine, the two went to the defendant's apartment at Fox Hollow and smoked it. Now, depleted of drugs and most of his cash, the defendant urged Puleri to use his remaining money to buy some beer. Puleri agreed and, at a nearby store, purchased a twelve pack of beer. Puleri took three beers, left the rest with the defendant, and went to a friend's house for the rest of the evening. Puleri testified that he last saw the defendant at about 9:45 P.M.

___

[14]Buell did not recall anyone being in the vicinity when he turned the bat over to Hill, but Hill testified that the defendant was standing about five to ten feet away from him, waiting to have his boots examined, when the bat was handed to Hill. According to him, the defendant said nothing about the bat, nor did he indicate that he recognized it. Several months after the defendant was indicted, he told one Bernard Marsh that the bat "involved in the case" was his and that "the last time he saw it was the day he moved into his apartment."

Telephone records show that a call was placed from the defendant's apartment at 9:10 P.M. to the home of Richard O'Leary. At that time, a friend of the defendant, Grover Finkle, Jr., was visiting O'Leary. Finkle confirmed that he spoke to the defendant during that call. When the defendant asked for a ride to Pittsfield to buy drugs, O'Leary, who operated a taxi for a living, agreed to drive Finkle, provided that he had the money to pay for a ride. Finkle assured him that they could pay, but the two did not leave immediately, instead continuing to drink beer and play cards. When they finally arrived at Fox Hollow, the defendant's appearance and demeanor at the door suggested that he had gone to sleep and that he was upset, at least initially, at having been awakened.

Finkle asked the defendant if he had money to pay for the taxi ride to Pittsfield, which was going to cost $22. The defendant said he would get it when they got to Pittsfield, but O'Leary refused to take them without all of the cash in advance.[15] The defendant asked O'Leary to wait a few minutes while he made some telephone calls. The record of calls from the defendant's apartment shows that the first call made after 9:15 P.M. was placed at 12:10 A.M., November 17, 2000.

The flurry of calls that were made between 12:10 A.M. and 1:43 A.M. fall roughly into two sets differentiated by the time made. The first set, some five calls, were made or received between 12:10 A.M. and 12:40 A.M. All three of the outgoing calls were made to Finkle's telephone number, where he had an answering machine that could be remotely checked. Forty minutes later, the second set — some ten telephone calls — were made or received between 1:22 A.M. and 1:43 A.M. Most of those calls were to pagers owned by drug dealers. The

---

[15]O'Leary testified that he thought the defendant had about thirteen dollars. The defendant had cashed his pay check in the amount of $457.15 on November 16, 2000. At about noon that day the defendant paid his ex-wife $200 in cash. The defendant had apparently spent the rest of the money that evening on drugs and alcohol.

There was also evidence that the defendant was expecting to receive $500 in cash on November 16, 2000, from the sale of his trailer. When the buyer did not have the money that afternoon, there was some evidence that the defendant became agitated, but the buyer paid him the next day, November 17, 2000.

undisputed evidence shows that the last telephone call from the defendant's apartment in the early morning hours of November 17 was made at 1:43 A.M., exactly twelve minutes before Whittemore's call to the police.

The police investigation also revealed that the defendant was among several employees at Fox Hollow who held a master key to all of the buildings on the property, including the victim's apartment. The defendant had been inside the victim's apartment in September to perform various tasks and on one occasion had fixed a window. Finn had met the defendant on that occasion and at another time Finn had been present when the victim's sister was visiting and the defendant was outside the victim's apartment. Finn heard the defendant say something like, ."Wow, have you any more good looking women in there?"

The defendant had also occasionally mentioned the victim to Carolyn White, Judi Cali, and Lisa Frenis, individuals with whom he regularly attended spiritual meetings. During these conversations, the defendant sometimes mentioned that the victim had expensive and beautiful furniture in her apartment. He also said that she had the thin body type that he liked and that she was attractive to him. The defendant acknowledged to police that he had tried to talk with her, but that the victim had been unresponsive. White reported that on one occasion the defendant was "kind of excited" when he told White, "I fixed her" by asking "about the window in her apartment and she turned around," and he said, "I scared her, really scared her." The defendant also told White that the victim's response appeared to be from her failure to recognize him and once he explained to her that he had been the one who had repaired the window, her concerns dissipated.

Dr. George Csank testified regarding the nature and extent of the victim's injuries. He was the plastic surgeon at the Berkshire Medical Center on the day she was admitted and subsequently performed at least six or seven reconstructive surgeries. Dr. Csank testified that there were at least fifteen separate lacerations in the scalp area, one measuring approximately twenty inches. All of the bones in the victim's skull and face had been broken, with the single exception of her jaw, which was the only bone intact. The victim's left ear had

been almost completely amputated and the victim also sustained at least seven fractures to the bones of both hands, as well as significant soft-tissue injuries to her hands.

Based on the nature and severity of the these injuries, Dr. Csank opined that the victim's injuries had been sustained by being struck with an object at least fifteen to twenty times on her head and between five to ten times on her hands. Dr. Csank testified that the fracture of the frontal bone of the victim's skull required a force of approximately 200 "G's," which Dr. Csank equated to the force produced in a head-on collision when the occupant of a motor vehicle hits the windshield while traveling at about sixty to seventy miles per hour. Finally, he gave an opinion that the victim's injuries were consistent with having been struck with an aluminum bat like the one that was recovered on the day of the incident.

Physical evidence found at the scene and elsewhere was subjected to further analysis and testing by the police. Specifically, the police recovered fifteen prints from the victim's apartment, including fourteen latent fingerprints and one palm print. The fifteen latent prints were compared with the prints of about twelve individuals, including the defendant, and he was excluded from all of them.[16] Investigators also took footprint impressions at the scene and made comparisons to the defendant's boots, with negative results. Trooper Hill checked the two doors in the victim's apartment for any indications of a forced entry, with negative results.[17]

Lieutenant Brian O'Hara, a State police officer trained in fingerprint analysis and bloodstain patterns, examined the blood on both sides of the pillowcase found in the victim's bedroom and gave an opinion that the lighter blood stain on one side of the pillowcase had been caused by the transfer of blood from an

---

[16]Of the fifteen latent prints, twelve were identifiable as belonging to the victim, James Finn, and police and emergency responders. No matches were found from the three remaining prints, but the defendant was excluded from two of the prints and the last print was useless to police.

[17]Hill carefully examined the sliding glass door that Finn had forced open earlier that morning. Hill looked at the latch locking mechanism, as well as the metal plate attached to the door casing into which the latch hooked, but did not detect damage of any kind to any part of the locking mechanism; neither did he see damage to the glass door itself.

individual's right hand onto the pillowcase. O'Hara testified that the hand imprint reflected a hand about the same size as his own hand. He also explained that, in order for such a stain to be made by a hand, the hand would have to have had a significant amount of blood on it, not all of which would have been transferred.

The bat was examined by Edward Bernstine, a State police chemist. He saw two reddish brown stains, each about one-eighth inch in diameter, on the grip tape that was on the bat's handle. Between the handle and the "Easton" crest was another very diffuse, faint red brown stain about one-half inch by one inch. Much closer to the crest, he observed a fourth stain that had an orange color. Bernstine tested each stain for the presumptive presence of blood. The tests of the three reddish brown stains were positive and the test of the orange stain was negative. Bernstine then tested the stain closest to the handle end of the bat to determine if human blood was present, with a positive result. Bernstine swabbed the three stains that tested presumptively positive for blood and forwarded the samples to the DNA unit for further testing.

The police also forwarded to the DNA unit two samples of known blood and nine samples from items that had tested presumptively positive for the presence of blood. In addition to the swab from the bat, the samples included known blood samples from the victim and the defendant; a swab from under the fingernails of the defendant's left hand; a swab from David Kotowski's upper forearm; swabs from both the door and dresser wall of the defendant's apartment; two cuttings from the defendant's comforter; a swab from a spot on the floor in the victim's bathroom; and fingernail scrapings from the victim.

Testing was conducted by Kellie Bogosian, a State police DNA analyst, who testified that the first test failed because a contaminant had been detected in one of the solutions. The only remaining samples that had sufficient material to permit further testing were the swab from the floor of the victim's bathroom, a swab of the stain on the wall behind the defendant's dresser, and two cuttings from the defendant's comforter. The results showed that the all of the blood found in the defendant's apartment was his own and the victim could not have contributed to

these samples. In addition, the defendant was excluded as a possible contributor to the sample of blood taken from the floor of the victim's bathroom.

An additional cutting from the tape on the bat where the presumptive presence of blood could still be detected was submitted to the laboratory. After several attempts, Bogosian was able to detect a single site of DNA and concluded that one in two randomly selected individuals would have a profile that could have contributed to that sample. She further testified that the sample she detected showed some signs of degradation, suggesting that it had been outside of the body for some time, but she could not estimate for what time period. She acknowledged that there was no way to determine whether the DNA she detected on the tape was from skin cells, blood, or another source of DNA.

2. *Sufficiency of the evidence.* At the close of the Commonwealth's case, and again at the close of all the evidence, the defendant moved for a required finding of not guilty. The defendant argues on appeal that it was error to deny his motions because the evidence failed to identify him as the assailant. "The standard which we apply in reviewing the propriety of the denial of a motion for a required finding of not guilty is 'whether the evidence, read in a light most favorable to the Commonwealth, was sufficient to satisfy a rational trier of fact of each element of the crime beyond a reasonable doubt.' " *Commonwealth* v. *Amado*, 387 Mass. 179, 186 (1982), quoting from *Commonwealth* v. *Basch*, 386 Mass. 620, 622 (1982). "We consider the state of the evidence at the close of the Commonwealth's case to determine whether the defendant's motion should have been granted at that time. We also consider the state of the evidence at the close of all the evidence, to determine whether the Commonwealth's position as to proof deteriorated after it closed its case." *Commonwealth* v. *Sheline*, 391 Mass. 279, 283 (1984). See *Commonwealth* v. *Walker*, 401 Mass. 338, 343 (1987).

We also recognize that the Commonwealth is permitted, as it did in this case, to rely solely on circumstantial evidence. See *Commonwealth* v. *Robertson*, 408 Mass. 747, 755 (1990). In addition, the inferences drawn from the evidence need only be

"reasonable and possible"; they need not be necessary inferences. See *Commonwealth* v. *Dostie*, 425 Mass. 372, 376 (1997). "Further, we assume, without deciding, that all questions concerning the admissibility of evidence would be resolved in favor of the Commonwealth." *Commonwealth* v. *Mazza*, 399 Mass. 395, 395 (1987).

We summarize the evidence, viewed in this light. The Commonwealth established that the defendant had a motive, namely robbery, to break into the victim's apartment. The evidence suggested that the defendant was a drug addict who had run out of drugs and money and desperately wanted to purchase more drugs. His telephone attempts to locate those drugs continued up until 1:43 A.M., about twelve minutes before the attack occurred. Compare *Commonwealth* v. *Anderson*, 396 Mass. 306, 312 (1985) (evidence showed that the defendant was angry and upset at the victim, who owed him money).

The evidence also showed that the defendant had the opportunity to commit the crime. Because he lived near the victim and possessed a master key to all the apartments in the complex, he could easily obtain access to the victim's apartment. More specifically, the evidence showed that the defendant knew or believed that the victim was wealthy and, therefore, likely to have cash or other valuables in her apartment that he could steal. Finally, there were no signs of a forced entry. See *Commonwealth* v. *Anderson*, 396 Mass. at 309, 312 (defendant was the last person to see the victim alive, there were no signs of a break-in, the key that was likely left in the back door was missing, and all the doors were locked from the inside).

Similarly, the defendant possessed the means to commit the crime, where the evidence permitted an inference that the defendant was the owner of the baseball bat that was located a short distance from the crime scene, and the medical testimony indicated that the injuries could have been inflicted by that bat. See *Commonwealth* v. *Salim*, 399 Mass. 227, 232-233 (1987) (defendant had persuaded a friend to purchase an icepick, which remained in the defendant's van until the day of the murder, and the fatal wounds were consistent with punctures caused by an icepick).

Finally, evidence that the defendant appeared agitated during

the police interviews, that he had lied about some of his activities the previous evening, that he was reluctant to be interviewed by police, and that he had wiped a spot of blood off of a closet door in his apartment all permitted the conclusion that he had a guilty conscience. See, e.g., *Commonwealth* v. *Salemme*, 395 Mass. 594, 601 (1985).

In this case however, evidence of motive, means, opportunity, and consciousness of guilt are not enough to establish guilt. Compare *Commonwealth* v. *Mandile*, 403 Mass. 93, 98 (1988) (evidence of motive, means, unexplained possession of property, and consciousness of guilt not enough to establish robbery). On this record the evidence is insufficient to permit a rational jury to find beyond a reasonable doubt that the defendant was the victim's assailant. Compare *ibid.*

Nothing in the record sufficiently links the defendant to the crime to permit the conclusion beyond a reasonable doubt that he was the perpetrator. Compare *Commonwealth* v. *Lombard*, 419 Mass. 585, 590 (1995). Piling inference upon inference does not amount to proof beyond a reasonable doubt. *Commonwealth* v. *Mandile*, 403 Mass. at 94. Contrast *Commonwealth* v. *Anderson*, 396 Mass. at 313; *Commonwealth* v. *Whitney*, *ante* 351, 352-356 (2005) (evidence that the victim's body was found about three months after his death, decomposing in the trunk of his vehicle, which was found about where the defendant had left a vehicle three months earlier, combined with strong evidence of motive, the defendant's inculpatory statements, and testimony providing proof of opportunity, was sufficient to sustain the murder conviction). For example, the baseball bat found near the scene was identified only as being consistent with the type of weapon that could have been used to inflict the injuries. Where the forensic testing revealed that several small stains on the bat could have been blood and that the DNA present on the tape on the handle merely showed that there was a possibility that it could have been used to commit the crime, it was just as likely that it had been used in a baseball game, particularly where the testing suggested that the DNA was not "fresh." Contrast *Commonwealth* v. *Anderson*, 396 Mass. at 308-309, 312 (a .38 caliber pistol ordinarily kept at the scene, of which the defendant was aware, was missing after the

murder and was one of two types of guns that could have been used to fire the bullets that killed the victim).

That the baseball bat belonged to the defendant, combined with evidence that he had the opportunity and a motive to commit the crime, is insufficient, standing alone, to establish the defendant's guilt. See *Commonwealth* v. *Morris*, 422 Mass. 254, 257-258 (1996) (presence of a plastic mask, with the defendant's thumbprint, left by the gunman at the shooting scene insufficient to establish guilt); *Commonwealth* v. *Swafford*, 441 Mass. 329, 340-341 (2004) (presence of the defendant's automobile at the scene of the shooting insufficient to prove presence or guilt).

In *Commonwealth* v. *Mazza*, 399 Mass. 395 (1987), the Supreme Judicial Court confronted facts similar to those here. In *Mazza* the defendant and the victim were interested in the same young woman. *Id.* at 396. The evidence permitted the inference that about midafternoon the defendant had called the victim and arranged to meet him at a Dorchester restaurant. *Id.* at 395-396, 399. The defendant then went with a friend, Mongiello, to that location. *Id.* at 396. Mongiello needed gasoline, so he drove into the gasoline station adjacent to the restaurant, and while he was filling his tank, the defendant walked over to the restaurant's parking lot. He returned about one and one-half minutes later and said, "There's a problem." *Ibid.* The two men left.

Shortly thereafter, the victim was found lying face down in his automobile, which was parked in the lot of the restaurant the defendant had just visited. The victim, who was covered in blood, had been shot to death. *Ibid.* Although the victim had a license to carry a gun and owned a gun, it was found in his home, and there was no evidence that either the victim or the defendant brought a gun to the restaurant. *Id.* at 398 & n.7. In the early evening, on the same day as the homicide, the police spotted the defendant about ten feet from a fire behind a local market, zipping his pants. The police sent the defendant on his way and pulled a cap and a pair of jeans from the fire. *Id.* at 397. After the murder, the defendant dyed his hair, shaved off his mustache, and fled to Vermont. *Id.* at 398.

The court recognized that the evidence clearly established that the defendant was present at the crime scene, and had a

motive and consciousness of guilt. *Ibid.* Where, however, there was no evidence that the defendant had a gun in his possession when he walked to the restaurant parking lot, nor any evidence that the victim and the defendant were there at the same time, and a lack of any proof that a gunshot had been heard, the court ruled that the evidence was insufficient "to identify the defendant as the perpetrator." *Id.* at 399. Here, where the evidence may be said to establish a motive, means, and an opportunity, the same result should obtain, because no other evidence was adduced linking the defendant to the crime.

In addition, the evidence in this case that the defendant had lied to the police about his whereabouts and had removed the spot of blood from the closet door in his apartment, while certainly permissible to show a guilty conscience, cannot fill the gap in the proof of identity.[18] See generally *Commonwealth* v. *Salemme*, 395 Mass. at 601-602; *Commonwealth* v. *Mazza*, 399 Mass. at 400 (consciousness of guilt evidence "cannot obscure the fact that the Commonwealth's proof failed").

The court in *Mazza* also considered as a factor in its decision the evidence that the defendant was "calm and composed" when he returned to Mongiello's car at the gas station. *Commonwealth* v. *Mazza*, 399 Mass. at 399. Here, the defendant's physical appearance and demeanor when he first encountered the police were similarly inconsistent with having just committed a brutal assault. Specifically, the medical evidence showed that a minimum of fifteen, and a maximum of twenty blows to the victim had been delivered with an object consistent with a baseball bat and that the blows were delivered with very significant force such that the victim's ear was almost beaten off. Common sense dictates that a substantial and sustained effort was necessary to carry out this attack and that, therefore, the assailant would manifest immediately thereafter some evidence of the physical strains of carrying out the attack. For example, sweat, labored breathing, and disheveled hair might be

[18]While wiping the spot clearly permits the inference that the defendant had a guilty conscience, it is not the equivalent of proof, without more, that the spot of blood was the victim's. See *Commonwealth* v. *Haggerty*, 400 Mass. 437, 442 (1987) (disbelief of testimony does not provide a basis for concluding facts contrary to that testimony).

expected to be visible on the perpetrator. In addition, if the defendant had been the attacker, not only would he have had to carry out this physically demanding act, but within the approximately twelve minutes before he greeted police, he would also have had to shed all of his clothes, except his boxer shorts, and wash off all obvious traces of blood from his person.[19]

The defendant then talked to the police, who ascribed to him absolutely none of the attributes that might be expected from an individual who had just engaged in all of these acts. The police were asked directly to describe the defendant's appearance. Neither officer indicated that the defendant was sweaty, that his hair was in disarray or wet, that he was out of breath, or that he appeared to be under the influence of an exciting event. This evidence, combined with the lack of any direct proof establishing the defendant as the perpetrator, bolsters our conclusion that the evidence was insufficient to support the verdict.

We also examine evidence of a possible third-party culprit to determine whether it bolsters or detracts from the Commonwealth's case. See *Commonwealth* v. *Torres*, 442 Mass. 554, 564-565 (2004) (in evaluating the sufficiency of circumstantial evidence, the court considered the quality of evidence pointing to the other possible assailant); *Commonwealth* v. *Robinson*, 30 Mass. App. Ct. 62, 72 (1991) (noting the process of elimination involved in an investigation). The defense at trial was that another person (i.e., the victim's husband) could have entered her apartment undetected and had the opportunity, the means, and a motive to harm her, and committed the crimes.[20] We have

---

[19]The blood stain on the pillowcase in the victim's apartment suggested that the attacker had a substantial amount of blood on his hand. Moreover, the amount of blood at the crime scene, combined with testimony that blood splatter was created during the attack, lends further credence to the inference that the attacker was covered in a significant amount of blood at the end of the encounter.

[20]Although the entire thrust of the defense was that the husband, rather than the defendant, had committed the crimes, and substantial third-party culprit evidence developed during both the case-in-chief as well as the defendant's case, the judge never instructed the jury that, "[w]ith respect to the critical issue of identification, the Commonwealth has the burden to prove beyond a reasonable doubt that the defendant was the person who committed the [crimes alleged in the indictments]." *Commonwealth* v. *Farley*, 443 Mass. 740, 745-

considered the third-party culprit evidence presented at trial.[21]

746 (2005), citing *Commonwealth* v. *Murray*, 396 Mass. 702, 709 (1986); *Commonwealth* v. *Denis*, 442 Mass. 617, 624 (2004). Neither party objected; nor is the issue raised on appeal.

The judge instructed the jury that in a case based upon circumstantial evidence, the evidence must establish "that the defendant is guilty and that there is no other reasonable theory or explanation, the evidence must not only be consistent with guilt, it must also be inconsistent with innocence." In *Commonwealth* v. *Farley*, 443 Mass. at 747, "[t]he judge instructed the jury several times that, in order to convict the defendant, they had to be convinced beyond a reasonable doubt that the defendant was the person who killed the victim. If any juror had harbored a reasonable doubt that someone other than the defendant killed the victim, the jury would not have convicted the defendant."

[21]The victim and her husband, David Kotowski, had been married for twenty-six years. Five or six months before the assault, the victim told her husband that she had feelings for another man, James Finn. Kotowski became upset and angry, and his behavior alternated between arguing and yelling at the victim and displaying his affection for her by buying gifts and telling her he loved her. In September, 2000, the victim moved out of the marital home. Her husband knew where she lived and had her telephone number, but had not visited her at her apartment and did not have a key. The victim testified that about one week before the attack she had a telephone conversation with her husband in which she mentioned divorce for the first time (although Kotowski denied that the conversation had occurred). The weekend before the assault the victim visited her husband and he gave her roses.

David Kotowski testified that on November 16, 2000, he arrived home for the evening at about 8:30 P.M., fell asleep at around 9:30 P.M., and received two telephone calls at about 5:20 A.M. and 5:50 A.M., but that no one was on the line when he answered. His "caller ID" indicated that the last call had been made from the victim's apartment. A neighbor testified that he saw Kotowski's automobile in the driveway at 6:20 A.M.

That morning, Kotowski received a call at work from Father Koonz, who said that the victim had not appeared for work at St. Agnes School. That call led Kotowski to contact police to check on the victim. Eventually, the police told Kotowski that his wife was injured and in the hospital.

Kotowski was questioned for forty-five minutes to an hour, during which time he appeared upset but cooperative. A police witness testified that Kotowski had blisters on his hands. At the conclusion of the interview Kotowski was allowed to go to the hospital.

Kotowski admitted that while he was at the hospital he may have told a police officer that he was concerned that if the victim woke up and saw him there, she might think he had done this to her. While at the hospital, Kotowski allowed a State police chemist to test his hands and arms for the presence of blood. The test indicated the presumptive presence of blood on Kotowski's forearm. On the evening of November 17, 2000, with Kotowski's consent, police searched his home and car. In the garage police saw a rack with baseball gloves, soccer balls, wooden baseball bats and athletic shoes. No testing was

We conclude that the introduction of substantial third-party culprit evidence detracted from the Commonwealth's case, and that the evidence at trial was insufficient to support a guilty verdict. Because of the result we reach, it is unnecessary to consider the other issues raised by the defendant.[22] The judgments are reversed, the verdicts are set aside, and judgments shall enter for the defendant.

*So ordered.*

---

done on the bats. The police also observed two garbage bags in the middle of the garage floor and a clothes dryer full of dark clothing.

When Kotowski's vehicle was searched, two wet towels reeking of bleach were found in a plastic bag in the trunk. The towels were from the same manufacturer, of the same material, and had the same pattern as a towel found in the victim's apartment. Kotowski explained that he had used the towels on a hunting trip the previous weekend, that he did not know how to do laundry and had used too much bleach on the towels, and that he had forgotten to remove the towels from the car after the hunting trip. A State police chemist testified that laundering clothes with bleach would be much more likely to impair testing for blood than would use of regular detergent.

On November 17, 2000, the State police also searched the bathrooms, the shower rooms, and the general office areas of the school where Kotowski was employed. They did not search the dumpster at the school. The Hinsdale chief of police testified that at about 6:00 A.M. on November 17, 2000, he drove by the school on his way to work and observed what he thought was Kotowski's car in the school parking lot. He also testified that he may have noticed a light on in Kotowski's office at the same time. The school was approximately a five or ten minute drive from Kotowski's home.

A long-time friend of the victim testified that the victim told her that Kotowski alternated between loving behavior and angry tirades. The victim also told her that her children were hurt and angry at her. The victim's sister testified that the victim told her that Kotowski had been verbally abusive, yelling at her for hours, berating her, and calling her a "slut" and a "whore." She also testified that the victim told her that her children were being cruel to her.

[22]For the same reason, we decline to address the defendant's separate but related appeal in which he argues that a single justice of this court improperly refused to accept his pro se *Moffett* brief, see *Commonwealth* v. *Moffett*, 383 Mass. 201, 208-209 (1981), for filing in his direct appeal. See the order of dismissal issued this day in Commonwealth *vs.* O'Laughlin, Appeals Court No. 2004-P-768.