## COMMONWEALTH *vs.* MICHAEL M. O'LAUGHLIN.

Berkshire. January 4, 2006. - March 10, 2006.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Burglary. Armed Assault in a Dwelling. Armed Assault with Intent to Murder. Assault by Means of a Dangerous Weapon. Practice, Criminal,* Required finding, Voir dire, Instructions to jury, Argument by prosecutor. *Evidence,* Consciousness of guilt, Expert opinion, Prior misconduct, Handwriting exemplar. *Constitutional Law,* Self-incrimination. *Search and Seizure,* Consent. *Deoxyribonucleic Acid. Intent. Grand Jury.*

At the trial of indictments charging burglary and armed assault in a dwelling, armed assault in a dwelling, armed assault with intent to murder, and assault and battery by means of a dangerous weapon, the evidence was sufficient to permit the jury to determine beyond a reasonable doubt that the defendant was the perpetrator of the crimes charged, where the jury could permissibly find that the defendant had a motive to break into the victim's apartment, i.e., robbery; that the defendant, who lived in the same apartment complex as the victim, had an opportunity to commit the crime and the means (an aluminum baseball bat, with the defendant's uncommon surname visible on the handle, found on the ground a short distance from the victim's apartment); and that the defendant demonstrated consciousness of guilt. [198-205]

At a criminal trial, the judge did not err in admitting evidence that the defendant withdrew his consent to allow the police to collect a sample of a small stain found on a closet door, where the evidence of refusal explained how the police permitted a potentially important piece of evidence to disappear and put the defendant's destruction of the evidence in its correct context; moreover, even if the admission of the refusal evidence were error, the error was not prejudicial, in that the defendant's statement after he allowed the police to reenter his apartment, to the effect that he had wiped the stain off the door and that, although he was not sure what the stain was, he thought it was his own blood, conveyed the same consciousness of guilt as the refusal testimony. [205-207]

The judge at a criminal trial did not err in denying the defendant's request for a hearing to challenge the reliability of deoxyribonucleic acid evidence. [207-208]

At the trial of indictments charging burglary and armed assault in a dwelling, armed assault in a dwelling, armed assault with intent to murder, and assault and battery by means of a dangerous weapon, the judge did not err in admitting evidence regarding the defendant's drug use on the night in question, where such evidence permitted the inference that he sought to rob the victim to obtain funds with which to purchase additional drugs, and

where such evidence also directly contradicted the defendant's claim to police that he had been sleeping just before being awakened by the screams of an animal. [208-209]

At the trial of indictments charging burglary and armed assault in a dwelling, armed assault in a dwelling, armed assault with intent to murder, and assault and battery by means of a dangerous weapon, the judge did not err in ruling inadmissible, on the basis of ambiguity, a handwritten note found in the victim's apartment that allegedly demonstrated a third party's intent to murder. [209]

At the trial of indictments charging, inter alia, armed assault with intent to murder, the judge did not err in failing to instruct the jury that the Commonwealth had to prove that the defendant had a specific intent to kill the victim, not merely an intent to disable or scare the victim off, where the judge instructed that the defendant had to have the intent to kill the victim and that to kill meant to cause a person's death. [210]

The judge at a criminal trial did not err in denying the defendant's motion to dismiss the indictments because of claimed flaws in the grand jury proceedings. [210-211]

This court declined to consider an argument that did not rise to the level of adequate appellate argument. [211]



INDICTMENTS found and returned in the Superior Court Department on December 6, 2000.

A motion to dismiss was heard by *Thomas J. Curley, Jr.,* J., and the cases were tried before him.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Kenneth I. Seiger* for the defendant.

*David F. Capeless,* District Attorney, for the Commonwealth.

COWIN, J. A Superior Court jury convicted the defendant of burglary and armed assault in a dwelling, armed assault in a dwelling,[1] armed assault with intent to murder, and assault and battery by means of a dangerous weapon. The Appeals Court, concluding that there was insufficient evidence to support the verdicts, reversed the judgments. See *Commonwealth* v. *O'Laughlin*, 63 Mass. App. Ct. 805, 824 (2005). We granted the Commonwealth's application for further appellate review. After careful consideration of the transcripts and arguments of the parties, we determine that, although the question is a close one,

---

[1]The first two indictments were charged under different statutes, G. L. c. 266, § 14, and G. L. c. 265, § 18A, and there is no allegation of duplicativeness.

there was sufficient evidence to support the verdicts, and we affirm the convictions.

Because of its decision on the sufficiency of the evidence, the Appeals Court did not reach the other arguments raised by the defendant. We, however, must do so, and we have concluded that the judge did not act improperly in (1) admitting evidence that the defendant withdrew his consent to allow the police to collect a sample of a small stain found on a closet door; (2) admitting prior bad act evidence regarding the defendant's drug use; (3) denying the defendant a hearing to challenge the reliability of deoxyribonucleic acid (DNA) evidence; (4) ruling inadmissible a handwritten note found in the victim's apartment that allegedly demonstrated a third party's intent to murder; (5) failing to inform the jury in his instruction on armed assault with intent to murder that the Commonwealth had to prove the specific intent to kill; and (6) denying the defendant's motion to dismiss the indictments because of claimed flaws in the grand jury proceedings. Finally, we have determined that the claim that the prosecutor misstated the evidence in his closing argument does not rise to the level of adequate appellate argument.

1. *Facts.* We summarize the evidence in the light most favorable to the Commonwealth, reserving further details for the discussion of specific issues below.[2] On the morning of Friday, November 17, 2000, the victim, Annmarie Kotowski, was discovered in her apartment, severely beaten but still alive. Although she survived, she had no memory of the attack or the weeks following it. The background of that attack, as developed by police investigation, is as follows.

The victim and David Kotowski were married for over twenty-five years and lived in Dalton. But, in May, 2000, the victim revealed to her husband that she was involved in a romantic relationship with James Finn of Dalton. The marriage became difficult and, in September, 2000, the victim moved out of the marital home. She moved into the Fox Hollow condominium complex in nearby Lee, apartment no. 15, Ecstatic Way, and lived there alone. Her relationship with Finn continued. She first discussed divorce with her husband approximately one

---

[2]The Appeals Court opinion contains a thoughtful and helpful summary of the evidence. *Commonwealth* v. *O'Laughlin*, 63 Mass. App. Ct. 805, 806-817 (2005).

week before the attack. Both the victim and her husband characterized their relationship as friendly but strained. (Other witnesses described the husband's attitude as alternating between loving and angry.)

The defendant, Michael O'Laughlin, also lived in the Fox Hollow condominium complex, in apartment no. 19, two apartments from the victim's. As of November, 2000, the defendant had worked for approximately eighteen months as a member of the condominium complex's maintenance staff. As such, he was one of several Fox Hollow employees with a master key to all of the buildings on the property, including the victim's apartment. He had been inside the victim's apartment in September to perform various tasks and on one occasion had fixed a window.

The defendant took some interest in the victim before the attack. Once, when the victim's sister was visiting, the defendant was outside the victim's apartment and said to the victim, "Wow, have you got any more good looking women in there?" The defendant also mentioned the victim five or six times to acquaintances. He said he thought the victim "had money" because she had beautiful furniture in her apartment, and that she had the thin body type that he found attractive. He told them that he said hello to the victim occasionally, but she ignored him. One acquaintance testified that on November 13, the defendant told her that he "really scared" the victim by asking "about the window in her apartment," though she then realized that he knew about the window because he was the maintenance man, at which point she ignored him and walked away.

On Thursday, November 16 (the day before the victim was found beaten), the defendant cashed a $457.15 pay check and made a $200 child support payment to his former wife. He also expected to sell a trailer to a neighbor for $500, and seemed agitated when the neighbor failed to come up with the money that day. (The neighbor paid the next day.)

On Thursday evening, the defendant and a friend, Mark Puleri, went to Pittsfield to purchase "crack" cocaine. They smoked the cocaine at Puleri's house. The defendant was "[n]ervous, jittery, [and] paranoid," typical behavior when he

smoked crack cocaine. Puleri then drove the defendant back to Pittsfield to buy more cocaine, which they smoked at the defendant's apartment at Fox Hollow. Now, depleted of drugs and most of his cash, the defendant asked Puleri for money to buy beer. Puleri purchased beer at a local store and left the defendant at his apartment with most of the beer.

Around 9 or 9:30 P.M., the defendant telephoned a friend, Grover Finkle, who was at Richard O'Leary's house, to ask for a ride to Pittsfield to buy drugs. Finkle had previously smoked crack cocaine with the defendant and knew at least one drug dealer. O'Leary and Finkle arrived at the defendant's apartment about one hour after he telephoned. O'Leary, who drove a taxicab, refused to drive to Pittsfield unless he was paid in advance, which the defendant was unable to do. The defendant made some telephone calls in an effort to get cab fare, but Finkle and O'Leary eventually left without giving him a ride.

Between 12:10 and 1:43 A.M. on what was now the early morning of November 17, telephone records show fourteen calls to or from the defendant's apartment. Three calls were made to Finkle's telephone number. Most of the calls, particularly the later ones, were to pagers owned by drug dealers. The last telephone call was made at 1:43 A.M.

Shortly before 2 A.M. on the same morning, George Whittemore, whose bedroom was directly above the victim's, was awakened by banging and screaming sounds coming from the apartment directly below. The screaming was that of a woman's voice, the banging sounded like "wood hitting wood," and the sounds lasted for about thirty seconds. Whittemore dialed 911 at 1:55 A.M. (twelve minutes after the defendant's last telephone call).[3] Whittemore stayed awake until he saw police cruisers enter the building's parking lot and he flashed his apartment lights to indicate his apartment for the police, but did not go outside to meet the police. Whittemore did not hear any vehicles

---

[3]The State police conducted a test to determine whether a person in the victim's apartment could hear Whittemore make the 911 call by having Whittemore reenact his movements in making the call. A State trooper standing in the victim's bedroom below was able to hear Whittemore's footsteps as he walked to the telephone, and was able to hear that he was speaking, but was unable to hear what was being said.

come to or leave the area from the time he heard the screaming until the time he saw the police arrive.

Officers William Tierney and Phillip Skowron of the Lee police department arrived six or seven minutes after Whittemore's 911 call. They sought apartment no. 202, the number reported in the dispatch, but were unable to find it.[4] The police did not hear or see anything amiss, but did see Michael O'Laughlin, the defendant, walking from the building on a walkway leading from apartment no. 19.

Although the defendant was wearing only boxer shorts, he did not appear affected by the thirty-five degree temperature. He asked the officers what had happened, and was told that there had been a report of a woman screaming. The officers asked if he had heard screaming and the defendant said that he had been awakened by screaming, but thought it was an animal because raccoons had been getting stuck in the dumpster, and he had lodged a stick in it to allow animals to climb out.[5] Tierney looked inside the nearby dumpster and saw a stick but no animals. During this brief conversation, the defendant appeared "uneasy and distant," kept his head down, and did not look directly at the officers. Although the police continued to search the area, they found nothing suspicious and left.

Whittemore, the neighbor who called 911, heard a woman moaning and crying directly below him several times that night, but he did not contact the police again. Later in the morning, he heard a man outside the victim's apartment calling her name and banging, then eventually the sound of glass breaking, and a man yelling, "Oh, my God." The man was James Finn, the victim's boy friend. Finn usually stopped for coffee before work with the victim at her apartment between 5:30 and 5:45 A.M., on weekday mornings. On November 17, Finn arrived at 5:45 A.M., but the victim did not answer her door when he knocked repeatedly and called out to her. He heard her say, "Who is it?" in an unusual voice. After unsuccessfully trying to reach her from a nearby

---

[4] The police later discovered that the number on the inside of Whittemore's door was 202, while a different number appeared on the outside. The apartments had recently been renumbered.

[5] The defendant's supervisor confirmed that there had been problems with raccoons in the dumpster.

public telephone, Finn returned and forced open a locked sliding glass rear door. The living area appeared in order, but he found the victim in her bedroom "lying on the floor next to the bed." "[T]here was just blood everywhere." Finn dialed 911 just before 6:30 A.M.[6]

The victim, who had severe wounds on her head and hands, was taken to Berkshire Medical Center in Pittsfield. Officers who arrived after Finn's 911 call observed blood in the victim's bedroom on the bed, the pillow, the floors, and the walls, and on the door jambs of the bathroom and bedroom. There was also "quite a bit" of blood that appeared to be "splatters" on the comforter. The bed rail had a small dent and wood splinters were found on the floor directly below the dented portion. The bed clothes appeared as if someone had slept in the bed. Apart from the above, all other items appeared to be intact.

The rest of the apartment was also neat, with nothing displaced, but the victim's purse was on the floor. A State trooper searched the apartment later that day. He did not detect signs of forced entry on either the front door or the rear sliding door that Finn forced open.[7] In the victim's purse were her credit cards, about $28 in cash, and a checkbook. There was $522 in cash in a dresser drawer, and several pieces of valuable jewelry, including diamonds, pearls, and an expensive watch, in the bedroom. The victim later indicated that no items of value were missing from her apartment.

The woman who lived in the apartment between the victim and the defendant knocked on the defendant's door sometime before 7 A.M. He answered in his boxer shorts, looking as if he had just awoken. When he was informed that someone had been "murdered," he replied, "What do you want me to do about it?"

At about 9:40 A.M., Officers William Tierney and Todd Briggs talked with the defendant outside the apartment building (where he worked during the day). Tierney noticed a "scratch or a dig

---

[6]Finn was eliminated as a suspect based on confirmation of his alibi, his shock on discovering the victim, and his cooperation with the police investigation.

[7]However, the first officer on the scene stated that the door "was indeed broken as [Finn] indicated." This discrepancy is not material to our discussion.

mark in [the defendant's] left cheek, small cut on his chin and a round, circular bruise . . . just below his left ear," but could not be certain how old the marks were. When they asked the defendant to give a statement at the Lee police station, he seemed reluctant, but agreed when told that Tierney would conduct the interview. The defendant arrived at the station at 10:40 A.M., and was told by Chief Ronald Glidden to wait for Tierney, who had not yet arrived. Tierney arrived twenty minutes later, and told the defendant that he would be "right with him." When Tierney returned five minutes later, the defendant was not there.

The defendant returned to the police station about twenty minutes later. Chief Glidden interviewed the defendant for about ten minutes, during which time the defendant seemed agitated.[8] The defendant stated that he was drinking before he went to bed and that the police cruisers woke him at approximately 2 A.M., but that he "didn't think he was awake until he heard the cruisers." He thought he may have heard foxes or raccoons before that, but was uncertain. The defendant said that he had "seen [the victim] around," and that he and a friend had joked about her boy friend. He also said that he had been in that apartment to repair a window.

State Troopers David Buell and Brian Berkel arrived at Fox Hollow around noon. Buell spoke to the defendant, who said that he went to Pittsfield with Mark Puleri the previous night, returned at 10:30 P.M., went to sleep around 11:30 P.M., and was awakened by screaming, which he thought was a fox fighting with a raccoon. He said that a short time later the police arrived and he went out to speak with them. After the officers left, he went back to sleep until 7:30 A.M., when he was awakened by his neighbor's knock on his door.

Buell asked the defendant for consent to search his apartment in order to eliminate him as a suspect due to his apartment's proximity to the victim's. The defendant consented, and also allowed Berkel to take photographs and two State police chemists to look for blood stains. Berkel photographed a red stain on a closet door near the kitchen area. After seeing the stain, a chem-

---

[8]Glidden did not recite the Miranda warnings to the defendant because he was not a suspect at the time.

ist asked whether the defendant's consent included taking swabbings. The defendant replied in the negative, and shortly afterward, he asked them all to leave his apartment.

Outside the apartment, the police conferred and decided to apply for a search warrant. They immediately returned to inform the defendant of their intent to secure the apartment and obtain a warrant. The defendant said that a warrant was unnecessary because he would allow them back into the apartment. He also told the officers that he had wiped the red stain off the closet door with his finger, and thought it was his own blood, but was not sure. The defendant also stated that he was concerned about a search because he was afraid police would find his drug paraphernalia and he had cash that he did not want taken.[9]

The red stain was no longer visible when the chemists returned, but the area where it had been tested positive for the presumptive presence of blood, and a sample was collected by swabbing. Chemists also collected swabs from two small, red-brown stains in the apartment that tested positive for the presumptive presence of blood, and cuttings of what appeared to be blood from the defendant's bed comforter. The defendant gave the police the clothes he said he wore the night before and permitted the chemist to examine his boots.

A State trooper searched the area around the apartment building with a dog trained to search by scent. The dog located an aluminum bat (characterized as a baseball or softball bat) lying in a wooded area approximately twenty-five yards from the building's dumpster. It appeared to have been covered with some leaves and debris, but was otherwise clean. An inscription of the defendant's last name was on the bat.

A few days after the attack, an "upset" defendant told a friend that he was a suspect in the assault. He said that he was "very happy that [the victim] had survived . . . [s]o that she could identify her assailant," but that with his "bad luck," the assailant was probably wearing a "Nixon mask" and came in with a baseball bat. He was arrested later that day. Sometime

---

[9]There was cash in the defendant's dresser, which presumably included the amount his neighbor paid him for a trailer earlier that day. The defendant was paid for the trailer after the time the victim was assaulted and before the police searched his apartment.

thereafter, while in custody awaiting trial, the defendant told another inmate that he owned the bat but had not seen it since he moved into his apartment.

In regard to physical evidence, the police recovered fourteen fingerprints and a palm print from the victim's apartment, but none of them matched those of the defendant.[10] Footprint impressions at the crime scene did not match the defendant's boots. State Police Lieutenant Brian O'Hara, trained in fingerprint analysis and bloodstain patterns, gave an opinion that a blood stain on the victim's pillow was caused by the transfer of blood from a person's right hand, but was not identifiable. He testified that the imprint was of a hand about the same size as his own with a significant amount of blood on it.

A State police chemist examined the bat. Three small reddish brown stains on the bat tested positive for the presumptive presence of blood. One tested positive for human blood. The three stains were swabbed and sent to the deoxyribonucleic acid (DNA) unit for further testing. Because of contamination in the DNA lab, tests consumed all the testable material without yielding results. An additional cutting from tape on the bat's handle from an area where the presumptive presence of blood could still be detected was submitted to the laboratory. A State police DNA analyst obtained human genetic material from the sample indicating two or more donors, with both a male and female possible in the mixture. She concluded that the victim could not be excluded as a contributor and that one in two of any randomly selected individuals "could have been the contributor."

Due to the contamination, the only samples with sufficient material for further testing after the failed tests were from blood on the victim's bathroom floor, a stain on the wall behind the defendant's dresser, and two cuttings from the defendant's comforter. Of these, all of the blood found in the defendant's apartment was his own, and the defendant was excluded as a

---

[10]Twelve of these prints were identifiable and excluded the defendant. Two were unidentifiable. One was identifiable, but police were unable to match it to any known prints.

possible contributor to the sample of blood taken from the victim's bathroom.

A surgeon who performed reconstructive surgeries on the victim after the attack testified that she had sustained between fifteen to twenty blows that broke nearly every bone in her face and skull. She also had defensive wounds on her hands caused by five to ten blows. The surgeon gave an opinion that the victim's injuries were caused by a long, sturdy, hard, round object, consistent with an aluminum bat like the one that was recovered near the apartment building.

2. *Sufficiency of the evidence.* The defendant moved for required findings of not guilty at the close of the Commonwealth's case and again at the close of all the evidence. He claims that his motions were improperly denied because the evidence failed to identify him as the assailant. In reviewing the denial of a motion for a required finding, we must determine "whether the evidence, in its light most favorable to the Commonwealth, notwithstanding the contrary evidence presented by the defendant, is sufficient . . . to permit the jury to infer the existence of the essential elements of the crime charged . . . ." *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-677 (1979), quoting *Commonwealth* v. *Sandler*, 368 Mass. 729, 740 (1975). "Additionally, the evidence and the inferences permitted to be drawn therefrom must be of 'sufficient force to bring minds of ordinary intelligence and sagacity to the persuasion of [guilt] beyond a reasonable doubt.'" *Commonwealth* v. *Latimore, supra* at 677, quoting *Commonwealth* v. *Cooper*, 264 Mass. 368, 373 (1928). Because the defendant moved for required findings at the close of the Commonwealth's case and again at the close of all the evidence, "[w]e consider the state of the evidence at the close of the Commonwealth's case to determine whether the defendant's motion should have been granted at that time. We also consider the state of the evidence at the close of all the evidence, to determine whether the Commonwealth's position as to proof deteriorated after it closed its case." *Commonwealth* v. *Sheline*, 391 Mass. 279, 283 (1984).

As the Commonwealth did in this case, it may rely wholly on circumstantial evidence. *Commonwealth* v. *Degro*, 432 Mass. 319, 325 (2000). As we view the evidence, the inferences we

draw need be only "reasonable and possible," not necessary, inferences. *Commonwealth* v. *Longo*, 402 Mass. 482, 487 (1988), quoting *Commonwealth* v. *Casale*, 381 Mass. 167, 173 (1980).

With these principles in mind, we proceed to discuss the evidence that permissibly convinced the jury of the defendant's guilt: evidence of motive, opportunity, and means, as well as consciousness of guilt. See, e.g., *Commonwealth* v. *Robertson*, 408 Mass. 747, 756 (1990); *Commonwealth* v. *Montecalvo*, 367 Mass. 46, 55 (1975). The jury could permissibly find that the defendant had a motive to break into the victim's apartment, i.e., robbery. The defendant had purchased crack cocaine on two different occasions on the evening of November 16 and had been ingesting drugs and beer all night. He had run out of both drugs and money later in the evening and was desperately seeking to obtain more drugs. His telephone records show calls, many of which were attempts to purchase drugs, as late as 1:43 A.M., only twelve minutes before the victim's upstairs neighbor telephoned the police department to report screams and banging sounds from downstairs. The defendant had been in the victim's apartment previously and had reason to believe that she was wealthy and might have cash or valuables. The defendant needed money immediately and the victim was a nearby and likely source.[11]

The defendant also had the opportunity to commit the crime. He lived in the same apartment complex as the victim, only two doors away. As a maintenance worker, he possessed a master key that provided access to her apartment. Moreover, the victim's upstairs neighbor testified that he heard no vehicles entering or leaving the area from the time he first heard the screaming until the police arrived.

There was also evidence of means. An aluminum bat was found on the ground a short distance from the victim's apartment. The jury would certainly be warranted in concluding

[11]The fact that nothing was stolen could be explained by the upstairs neighbor's telephone call to the police. The reenactment indicated that the neighbor could be heard in the apartment below. It is a reasonable inference that the defendant was frightened off before he could steal anything when he heard the neighbor speaking.

that the bat was the defendant's. His surname, not a common one, was visible on the bat handle and he mentioned to someone in jail that he was the owner of the bat the police had found.[12] Although covered with leaves and debris, the bat was otherwise clean when found.

The Commonwealth also presented abundant evidence of consciousness of guilt. When the police first arrived at the apartment complex, they encountered the defendant walking outside clothed only in boxer shorts in near freezing temperature. In talking with the police at that time, the defendant appeared "uneasy and distant," never looking at the officers. The defendant lied to the police when he said that he had been awakened by screaming; his telephone records indicate many calls until twenty minutes before the arrival of the police. And he later told the police that he had been awakened by the noise of the cruisers. In another police interview, he gave yet another version: he fell asleep at 11:30 P.M., was awakened by screaming that he believed to be animals fighting, went back to sleep and was awakened in the morning by a neighbor who reported an assault. (The neighbor testified that the defendant's response to this news was, "What do you want me to do about it?") In addition, the defendant was reluctant to be interviewed by the police, and when he did speak with them, he appeared "agitated."

Perhaps the most significant consciousness of guilt evidence is the defendant's reaction when the police sought a swabbing of a red stain on a closet door in his apartment. Although the defendant had previously consented to a police search of his apartment, he asked the police to leave. He later permitted them to return, but only after he had removed the stain from the door with his finger. He told the police then that, although he was not sure what the stain on the door was, he believed that it was his own blood. This evidence reflected not merely a general consciousness of guilt, but indicated that the defendant feared that the blood stain could be that of the victim, a fear he would have only if he were in fact the perpetrator.

---

[12]He said that he had not seen the bat since the day he had moved into the complex. (It is not clear from the record when the defendant moved into the complex.)

Additional evidence consistent with the defendant's guilt is that at 10 A.M. on the morning of the assault the defendant was observed to have a "scratch or a dig mark" on his cheek, a small cut on his chin and a bruise on his neck. Although the police officer could not be certain whether these marks were fresh, it could be inferred that the injuries were sustained during a physical encounter with the victim.

Contrary to the Appeals Court, we conclude that the above evidence was sufficient to permit the jury to determine beyond a reasonable doubt that the defendant was the perpetrator of the vicious attack on the victim. In reaching its decision, the Appeals Court relied on *Commonwealth* v. *Mazza*, 399 Mass. 395 (1987), where, on facts somewhat similar to those here, we held that the evidence was insufficient "to identify the defendant as the perpetrator." *Id.* at 399. But in the *Mazza* case, there was less incriminating evidence than in the present case. In that case, the defendant and the victim were both interested in the same woman. It could be inferred that the defendant planned to meet the victim at a local restaurant. The defendant, accompanied by a friend, Mongiello, went to the restaurant. Mongiello drove to a gasoline station next to the restaurant, and while Mongiello was getting gasoline, the defendant went to the parking lot of the restaurant. The defendant returned in approximately one and one-half minutes, said, "There's a problem," and the two men left. *Id.* at 396.

Soon after, the victim's body was found face down and covered in blood in his Jeep in the parking lot of the restaurant. He had been shot to death. The Commonwealth presented no evidence that the defendant had brought a gun to the restaurant or that the victim had one in his possession at that time. The friend did not hear a gunshot and, in fact, did not see the victim's Jeep.

At about the time the body was discovered, a police officer saw the defendant about ten feet from a fire in a market. The defendant told the police he was urinating. The next night, a detective found a "scalley cap" and a pair of wet jeans behind the market. After the assault, the defendant altered his appearance and fled to Vermont. Although he was generally known as "Tony Ramo," after the homicide the defendant used his legal name, Antonio Mazza. *Id.* at 397-398.

The court acknowledged that there was evidence of the defendant's "presence at the [crime scene] together with the evidence of motive and consciousness of guilt." *Id.* at 398. But "there was no evidence that the defendant had a gun in his possession when he walked to the restaurant parking lot, nor any evidence that the victim and the defendant were there at the same time, and a lack of any proof that a gunshot had been heard." *Commonwealth* v. *O'Laughlin,* 63 Mass. App. Ct. 805, 821 (2005). Thus, the court concluded that the evidence was insufficient "to identify the defendant as the perpetrator." *Commonwealth* v. *Mazza, supra* at 399.

Although there are similarities between the *Mazza* case and the present one, here the Commonwealth presented more evidence linking the defendant to the assault. The evidence of motive and opportunity are similar in the two cases. But in the instant case we have evidence of means as well (the defendant's aluminum bat, hidden under the leaves outside the complex) and significantly stronger evidence of consciousness of guilt (lies to the police about being asleep at the time of the assault, varying versions of how he was awakened, his lack of concern when he was told about the assault, reluctance and agitation about police interviews, and the wiping of the red stain in his apartment when the police showed interest in it). That the defendant was found, in the immediate aftermath of the crime, walking outside in the cold clad only in his underwear would be consistent with his having disposed of bloody outer garments. The jury could find that, had the defendant gone outside to check for animals in the dumpster (as he claimed), it was implausible that he would have done so without putting on at least minimal clothing, not only for purposes of protection against the cold but also for purposes of decency. Finally, there was evidence of bruises or injuries on the defendant's face.[13]

---

[13]The Appeals Court considered the defendant's physical appearance, when he first spoke with the police only about twelve minutes after the attack, as detracting from the Commonwealth's case. *Commonwealth* v. *O'Laughlin,* 63 Mass. App. Ct. 805, 821-822 (2005). The defendant did not manifest any signs of recent physical exertion (sweat, shortness of breath, wet hair or disarray), but in the light most favorable to the Commonwealth, there was no reason why the defendant would be sweaty or short of breath twelve minutes

These factors add sufficient strength to the evidence to distinguish this case from the situation in the *Mazza* case.

Our analysis differs from that of the Appeals Court in another respect. The Appeals Court apparently considered it significant that third-party culprit evidence "detracted" from the Commonwealth's case.[14] The Appeals Court has read too much into our cases concerning deterioration of the Commonwealth's case. *Commonwealth* v. *O'Laughlin*, *supra* at 824. As we said in *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-677 (1979), we must consider the evidence "in its light most favorable to the Commonwealth, *notwithstanding the contrary evidence*" (emphasis supplied). "Deterioration would occur not because the defendant contradicted the Commonwealth's evidence . . . but because evidence for the Commonwealth necessary to warrant submission of the case to the jury is later shown to be incredible or conclusively incorrect" (citation omitted). *Kater* v. *Commonwealth*, 421 Mass. 17, 20 (1995). The theory applies, for example, when reasonable doubt is created as a matter of law by evidence of the defendant's incarceration at the time of the incident. See *Commonwealth* v. *Vaughn*, 23 Mass. App. Ct.

---

after the incident. To the officers, he did appear "uneasy."

[14]The defense sought to portray the victim's husband, from whom she had recently separated, as the third-party culprit. The husband was aware of the wife's new address and that she was involved with another man. The victim described the husband as being "upset" but not angry about this relationship. Others said the husband alternated between being "nice" and verbally abusive. The husband testified that he was at home at the time of the assault and that he received two telephone calls just before 6 A.M. Each time his "caller ID" indicated the source of the call as the victim's apartment, but no one was on the line. He dialed the number, and a man answered. One witness thought he saw the husband's car in his workplace parking lot at approximately 6 A.M. on the morning of the attack, but a neighbor saw the husband's car parked at home at 6:20 A.M. The husband was generally cooperative with the police, but did not permit the police access to "personal" letters to his wife. Tests indicated the presumptive presence of blood on one of the husband's forearms on the day of the attack. On the evening of November 17, the police observed garbage bags on the floor of the husband's garage and dark clothing in a clothes dryer. Two wet towels strongly smelling of bleach were found in a plastic bag in the trunk of the husband's car. One of the towels was the same as towels found in the victim's linen closet. The husband explained that the towels smelled because he did not know how to do laundry and had used too much bleach on them. He said he brought them on a hunting trip the previous weekend and had forgotten them in the trunk. Finally, the husband kept wooden baseball bats and other athletic equipment in his garage.

40, 42-43 (1986). Thus, if the Commonwealth has presented sufficient evidence that the defendant committed the crime, the fact that the defendant has presented evidence that he did not does not affect the sufficiency of the evidence unless the contrary evidence is so overwhelming that no rational jury could conclude that the defendant was guilty. The defendant's evidence regarding a third-party culprit (the victim's husband) simply tended to contradict the Commonwealth's evidence; it did not show it to be "incredible or conclusively incorrect." *Kater* v. *Commonwealth, supra.* See *Commonwealth* v. *Pike*, 430 Mass. 317, 323 (1999) (although "evidence contradicted, and tended to undermine . . . the Commonwealth's case," it did not demonstrate that Commonwealth's evidence was "conclusively incorrect"); *Commonwealth* v. *Walker*, 401 Mass. 338, 343-344 (1987) (jury free to disbelieve defendant's version; nothing "compelling" in evidence which caused Commonwealth's case to "deteriorate").

The present case is akin to our recent decision in *Commonwealth* v. *Lao*, 443 Mass. 770, 779-780 (2005). There, the evidence indicated that the victim was assaulted between 9 and 9:30 A.M. and that her boy friend found her bleeding and unconscious shortly after 10 A.M. An acquaintance of the defendant (the victim's husband) testified to seeing the defendant walking from the crime scene between 9 and 9:30 A.M. The police spoke to the defendant that afternoon and he provided an alibi for the morning. The alibi was essentially corroborated, but allowed a narrow time frame in which the defendant could have committed the crime. The police did not locate any blood in a search of the defendant's van and clothing and footwear impressions in the victim's apartment did not match any of the defendant's footwear. We affirmed the conviction because evidence of the defendant's motive to kill his wife and his presence at her apartment "around the approximate time of the murder" were sufficient to withstand the defendant's motion for a required finding of not guilty. *Id.* at 780. We reached this conclusion notwithstanding the claim that the Commonwealth's case rested "entirely" on one eyewitness who placed the defendant at the scene of the crime, that no forensic evidence connected the defendant to the crime, and that

evidence of motive was weak. *Id.* at 778-780. We held that "[a]ny weaknesses in this identification were for the jury to weigh, and did not constitute grounds for a required finding of not guilty." *Id.* at 780. See *Commonwealth* v. *Anderson,* 396 Mass. 306, 312-313 (1985) (sufficient evidence where testimony proved defendant had access to murder weapon, was present with victim at time of shooting, was angry with victim about debt, and gave inconsistent statements to police when apprehended after fleeing).

3. *Withdrawal of consent.* The defendant contends that admission of so-called "refusal" evidence violated his right against self-incrimination. The defendant objected to the admission of this evidence. We review to determine whether there was error and, if so, whether "the conviction is sure that the error did not influence the jury, or had but very slight effect." *Commonwealth* v. *Alphas,* 430 Mass. 8, 13-14 n.7 (1999), quoting *Commonwealth* v. *Flebotte,* 417 Mass. 348, 353 (1994). Article 12 of the Massachusetts Declaration of Rights provides that no person shall be compelled to accuse or furnish evidence against himself. Pursuant to this mandate, testimonial evidence of a defendant's refusal to comply with a police request may not be admitted against him. See *Commonwealth* v. *Conkey,* 430 Mass. 139, 141, 143 (1999) (error to admit evidence that defendant refused to submit to fingerprint test); *Commonwealth* v. *Hinckley,* 422 Mass. 261, 264 (1996) (refusal to turn over sneakers); *Commonwealth* v. *McGrail,* 419 Mass. 774, 779-780 (1995) (refusal to take field sobriety test); *Commonwealth* v. *Lydon,* 413 Mass. 309, 314-315 (1992) (refusal to submit to hand swabbing for evidence of gunpowder residue).

The evidence complained of here is that the defendant, after initially consenting to a police search of his apartment, revoked his consent when an officer asked whether the consent included taking swabbings of a reddish stain, possibly blood, on a closet door. It would have been possible to limit the evidence to the following: the police saw the reddish stain, left to obtain a warrant, and found on their return that the stain had disappeared. In addition, the defendant said that he had removed the stain and thought it was his blood. However, this scenario would result in the jury speculating as to how the police permitted a potentially

important piece of evidence to disappear. Such an editing of events destroys the thrust of the evidence and transforms it from testimony that inculpates the defendant to evidence that leaves the police subject to a charge that they investigated in a careless manner and permitted the loss of important evidence. Given the particular configuration of evidence here, the refusal evidence is permissible. We do not, however, suggest by our conclusion any general validation of refusal evidence.[15]

We apply the same logic we have applied to a defendant's postarrest silence. Ordinarily, any evidence of such silence is not admissible because it is impermissible to comment on the defendant's invocation of the right to silence. See *Commonwealth* v. *Martinez*, 431 Mass. 168, 183 (2000). Nevertheless, we permit such evidence when it is necessary in the context of the entire conversation for the limited purpose of clarifying why a police interview ended abruptly. *Commonwealth* v. *Farley*, 432 Mass. 153, 158 (2000). *Commonwealth* v. *Martinez, supra* at 183-184. *Commonwealth* v. *Habarek*, 402 Mass. 105, 110 (1988). Similarly, evidence of the defendant's refusal to let the police remain in his apartment would be impermissible, but for the circumstances in which it was offered, i.e., to explain the loss of potentially important evidence and to put the defendant's destruction of the evidence in its correct context.[16] In any event, even if it were error to admit this refusal evidence, the error

---

[15]Here, the defendant first agreed to the search, then withdrew his consent, and finally, after he had destroyed the evidence, permitted the police to resume the search. It is the intervening action of the defendant, and his later consent, that distinguishes this situation from that in *Commonwealth* v. *Conkey*, 430 Mass. 139, 143 (1999).

[16]While such evidence is allowed in context, corresponding argument is not. A prosecutor may not seek from a jury an adverse inference from exercise of a constitutional right. *Commonwealth* v. *Habarek*, 402 Mass. 105, 110 (1988).

Although not raised by the defendant, part of the Commonwealth's closing argument causes difficulty in this regard. The prosecutor stated: "Why else would he [the defendant] get concerned and wipe off a spot off [*sic*] that door in his apartment after telling the police to leave." The first portion concerning wiping away the blood is clearly within the bounds of proper advocacy. However, with respect to the second portion, concerning "telling the police to leave," the defendant had a constitutional right to order the police out and the Commonwealth could not seek an adverse inference from testimony that the defendant did so.

The latter reference could rationally be interpreted in two ways: as an

was not prejudicial. The statement by the defendant after he permitted the police to reenter his apartment that he had wiped the stain off the door and that, although he was not sure what the stain was, he thought that it was his blood, conveyed the same consciousness of guilt as the refusal testimony.

4. *Denial of hearing to challenge the reliability of DNA evidence.* The defendant filed a motion in limine for a voir dire, see *Daubert* v. *Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993); *Commonwealth* v. *Lanigan*, 419 Mass. 15 (1994), to determine the reliability of the Commonwealth's DNA evidence. The defendant maintains that the judge's denial of the motion resulted in the jury's hearing unreliable scientific evidence regarding DNA on the bat. "If the process or theory underlying a scientific expert's opinion lacks reliability, that opinion should not reach the trier of fact. . . . [T]he judge must rule first on any challenge to the validity of any process or theory underlying a proffered opinion." *Commonwealth* v. *Lanigan, supra* at 26. The defendant submitted an affidavit of Dr. William Shields, a biology professor at the College of Environmental Science and Forestry of the State University of New York, who reviewed the State police laboratory's tests. Dr. Shields stated that he "agree[d]" with the laboratory's methods and conclusions that the reportable results indicated a mixture of DNA to which the defendant and victim, as well as fifty per cent of the population, could have contributed. The affidavit contested only the laboratory's threshold levels for reportable results, a matter for cross-examination. It did not allege that the process was invalid. *Id.* Furthermore, the affidavit did not cite any study or criteria supporting the expert's statement regarding the threshold reporting standards of the State police laboratory.[17]

The defendant also argues that the probative value of this

improper reminder to the jury that the defendant dismissed the police from his apartment, or simply as a practical means to identify the period of time in which the defendant wiped away the blood. In context, we conclude that the prosecutor's argument was permissible, while noting that, for the reasons stated, the second portion of the remark would have been better left unsaid. Even if the argument crossed the line, which we do not decide, there was no objection, and the remark does not rise to the level of a substantial risk of a miscarriage of justice. *Commonwealth* v. *Grandison*, 433 Mass. 135, 141-142 (2001).

[17] The defendant's expert also stated in his affidavit that he disagreed with

DNA evidence was minimal and not admissible because it only demonstrated that the likelihood that any individual contributed to the mixture of DNA was one in two. The evidence was also that a male and a female could have contributed to the DNA. The probative value of the evidence is for the jury to decide.

The defendant contends further that the inconclusive nature of the test results rendered the evidence more prejudicial than probative. See *Commonwealth* v. *Sicari*, 434 Mass. 732, 751-752 (2001). The defendant's proposition is not supported by our case law. In *Commonwealth* v. *Benoit*, 382 Mass. 210, 220-221 (1981), bloodstained articles were tested and the blood was found to be type O. We stated: "Both the defendant and the victim, as well as a large segment of the world population, have type O blood. . . . Evidence is not rendered prejudicial merely because it is inconclusive [and] it is for the jury to determine the probative value to be accorded relevant evidence." The same principle applies here. There was no error.

5. *Admissibility of evidence of the defendant's use of drugs.* The defendant claims that the judge permitted the jury to hear overly prejudicial evidence of bad acts, specifically, that he smoked crack cocaine and sought to obtain additional cocaine the night of the incident. Prior bad acts are admissible to show knowledge, intent, motive, opportunity, or absence of mistake or accident. See *Commonwealth* v. *Helfant*, 398 Mass. 214, 224 (1986); *Commonwealth* v. *Imbruglia*, 377 Mass. 682, 695 (1979). We review to determine whether the prejudice from such evidence outweighs its probative value; the judge's decision is accepted unless there has been clear error. *Commonwealth* v. *DelValle*, 443 Mass. 782, 790 (2005). The evidence of the defendant's drug abuse the night of the crime and his desperate attempt to obtain more cocaine or money for it permitted the inference that he sought to rob the victim for funds to buy additional drugs. The evidence also directly contradicted the defendant's claim to the first officers on the

the "threshold RFU of 75 used by the Massachusetts State Police crime Laboratory." As the judge noted, the affidavit does not even define RFU. Moreover, the fact that one person (the expert) disagrees with the threshold is hardly a basis for requiring a *Daubert-Lanigan* hearing. See *Daubert* v. *Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993); *Commonwealth* v. *Lanigan*, 419 Mass. 15 (1994).

scene that he had been sleeping just before being awakened by screams of an animal. See *Commonwealth* v. *Horton*, 434 Mass. 823, 828 (2001) (no abuse of discretion to admit evidence of defendant's drug dealing and prior plan to rob bank as those acts relevant to motive behind killings). In addition, both at the time the evidence was admitted and in his final charge, the judge gave the jury careful limiting instructions about the use of this evidence.

6. *Admissibility of handwritten note.* The defendant attempted to introduce a handwritten note found in the victim's bedroom and claims that the judge's exclusion of the note violated his constitutional right to present a defense under the Sixth Amendment to the United States Constitution and art. 12. The note read: "Threat to kill him if seen in public. . . . Suck on his dick, blow him fuck him your [*sic*] a whore." The victim did not recall writing the note and denied that it was in her handwriting. Another note found in the victim's pocketbook was admittedly in her handwriting and was in evidence. The defendant is correct that expert analysis of the handwriting on the note is not necessary and that comparison to a genuine specimen by the trier of fact is accepted practice in Massachusetts. *Commonwealth* v. *O'Connell*, 438 Mass. 658, 662 (2003). Here, he argues, the jury could have used the handwriting on the note admittedly in the victim's writing as a standard for comparison of the disputed note to decide whether the note was written by the victim.

The defendant claims that the note was important to his defense that the estranged husband was the culprit because it contradicted testimony that the relationship between the Kotowskis was not hostile and because it tended to show that the husband had violent, homicidal thoughts. There was no error. The judge excluded the note because it was ambiguous, and we agree. Even if we assume that the victim wrote the note, there is no evidence who the speaker was and who was the subject of the speaker's venom. There was no evidence to connect the note to the victim's husband or to establish who was the object of the threat. Had the note been admitted, it would have required the jury to speculate as to its meaning and genesis. See *Commonwealth* v. *Gagnon*, 408 Mass. 185, 198 (1990).

7. *Instruction on intent to kill.* The defendant maintains that the judge erred in his instruction on the indictment charging armed assault with intent to murder. The claim is that the judge failed to instruct that the Commonwealth had to prove that the defendant had a specific intent to kill the victim, not merely an intent to disable or scare off the victim. There was no objection. We review to determine whether there was error and, if so, whether it created a substantial risk of a miscarriage of justice. *Commonwealth* v. *Robinson*, 444 Mass. 102, 105 (2005). The judge instructed: "Now, the third element that the Commonwealth has to prove beyond a reasonable doubt is that the defendant assaulted [the victim] and intended to kill her. By 'intent' again I mean the act of concentrating or focusing the mind for some perceptible period. Such intent requires a conscious act, with the determination of the mind to do the act. It is contemplation rather than reflex and it must precede the act. 'To kill' means to cause the death of another human being."

Given this instruction, it was unnecessary to add that the Commonwealth must prove that the defendant had more than an intent to disable or scare off the victim. It was sufficient that the judge instructed that the defendant must have the intent to kill the victim and that to kill means to cause a person's death.

8. *Motion to dismiss.* The defendant argues that the judge erroneously denied his motion to dismiss the indictments because the Commonwealth did not introduce sufficient evidence to support them and because the Commonwealth distorted the evidence by failing to present evidence of another suspect. See *Commonwealth* v. *O'Dell*, 392 Mass. 445, 446-447, 450-451 (1984); *Commonwealth* v. *McCarthy*, 385 Mass. 160, 163 (1982). The evidence against the defendant presented to the grand jury was essentially the same as that offered at trial. Because we have concluded that that evidence was sufficient to withstand motions for required findings, it clearly sufficed for grand jury purposes. As far as the contention that the Commonwealth did not present evidence of Kotowski as a suspect, because that evidence was not sufficient to create reasonable doubt for the jury, it cannot be said that it would have affected significantly the grand jury's result. See *Commonwealth* v. *Trowbridge*, 419 Mass. 750, 754 (1995); *Commonwealth* v.

*LaVelle*, 414 Mass. 146, 150-151 & n.2 (1993). "Prosecutors are not required in every instance to reveal all exculpatory evidence to a grand jury." *Id.* at 150, quoting *Commonwealth* v. *McGahee*, 393 Mass. 743, 746 (1985).

9. *Closing argument.* The defendant claims that the prosecutor improperly argued that the defendant held a pillow on top of the victim with his right hand, in the absence of evidence that the defendant touched the pillow. The defendant then contends that defense counsel's failure to object to the improper argument was ineffective assistance of counsel creating a substantial risk of a miscarriage of justice. The defendant offers no further argument on the point and does not inform us how he was prejudiced by this alleged impropriety. His argument does not rise to the level of adequate appellate argument. Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975). Cf. *Commonwealth* v. *Whitford*, 16 Mass. App. Ct. 448, 452 (1983).

*Judgments affirmed.*